SARA V. TOMLINSON, PLAINTIFF IN ERROR, v. ARMOUR
& COMPANY (A CORPORATION), DEFENDANT IN
ERROR.

Submitted January 10, 1908—Decided June 15, 1908.

1. A judgment in favor of either party upon demurrer to a declara-
tion is a final judgment reviewable on error.
2. The record returned to a writ of error, besides reciting the
plaintiff's declaration and the demurrer thereto, set forth simply
that the court below, having heard argument upon the demurrer
and duly considered the same, did order that the demurrer be
sustained with costs, there being no more formal entry of judg-
ment nor any award of a specific sum for costs. After joinder in
error and argument of the cause upon the merits—*Held*, that, for
purposes of review, the judgment as returned was sufficient in
substance and would be treated as if amended in the court of
review with respect to matters of form.
3. The common joinder in error amounts to an admission by defend-
ant in error that what is returned as the record of the judgment
below is in truth the record thereof, so that after joinder in error
neither party can of right allege diminution or have a *certiorari*.
4. *Thompson* v. *Bowne*, 10 *Vroom* 2, and *Cooper* v. *Vanderveer*, 18
*Id.* 178, criticised; *Stein* v. *Goodenough*, 40 *Id.* 635, distin-
guished.
5. The technical phrase *ideo consideratum est* is not necessary to
constitute such a judgment as will support a writ of error. The
want of this technical phrase, being a defect of form merely, may
be amended, if necessary, in the court of review.
6. A declaration setting forth that defendant was engaged in the
business of putting up in tin cans or vessels, and vending, meats
for food and domestic use, and did put up a certain can of ham
for food and domestic use, which was sold by the defendant to a
retail dealer, to be sold to customers and patrons; that plaintiff
purchased said can of ham from said retailer for food and do-
mestic use; that the defendant negligently put up in said can of

ham diseased, unfit and unwholesome ham, which was deleterious and poisonous to the human body and health, and that the plaintiff, without fault or negligence on her part, ate a piece of ham taken from said can, and in consequence thereof became poisoned and sick with ptomaine poison—*Held*, to set forth a good cause of action, notwithstanding the absence of *scienter*.

7. Irrespective of the presence or absence of contractual obligations arising out of the dealings between manufacturer and retailer and between retailer and consumer, the manufacturer of canned goods is under a duty to him who, in the ordinary course of trade, becomes the ultimate consumer to exercise care that the goods which he puts into cans and sells to retail dealers, to the end that such dealers may sell the same to customers and patrons as food, are wholesome and fit for food, and not tainted with poison.

On error to the Supreme Court, whose opinion is reported in 45 *Vroom* 274.

For the plaintiff in error, *Carrow & Kraft*.

For the defendant in error, *Gaskill & Gaskill*.

The opinion of the court was delivered by

PITNEY, CHANCELLOR. This writ of error is brought to review a decision of the Supreme Court sustaining defendant's demurrer to plaintiff's declaration.

The record returned by that court to the writ of error, besides reciting the declaration and the demurrer thereto, sets forth simply that the court, having heard the argument of counsel upon the demurrer, and having duly considered the same, did order that the demurrer be sustained, with costs. There is no more formal entry of judgment, nor any award of a specific sum for costs.

Upon this record the plaintiff in error assigns error in that the Supreme Court ordered that the demurrer be sustained, with costs, and decided that judgment should be given for the defendant, whereas judgment should have been given for the plaintiff. The defendant in error filed the common joinder in error, averring "that there is no error either in the record and proceedings aforesaid or in giving the judgment afore-

said," and praying "that the judgment aforesaid, in manner aforesaid given, may in all things be affirmed," &c.

The case has been submitted upon arguments addressed to the merits, without suggestion of a motion to quash, or other objection, based upon the want of a proper judgment returned. The question suggests itself, however, whether the record manifests a definitive adjudication against the plaintiff in error which ought to be reviewed here.

The general rule is laid down in 2 *Tidd* (*3d Am. from 9th Lond. ed.*) 1141, as follows: "No writ of error can be brought but on a judgment, *or an award in the nature of a judgment,* for the words of the writ are *si judicium redditum sit,* &c. And hence it was formerly holden that a writ of error could not be brought before judgment given, and if tested before, it was no *supersedeas.* But it seems to be now agreed that a writ of error, bearing teste before judgment, is good, so as the judgment be given before the return of it, and this is the usual course for preventing execution, and the allowance of it may be served before the return of the writ of inquiry and final judgment. Still, however, if the writ of error be returnable before judgment, it may be quashed." And (at *p.* 1162) it is said: "If the writ of error be returnable before judgment is given, it may be quashed on motion. But where the writ of error on a judgment in the Common Pleas was returnable in Easter Term, and the costs were not taxed and final judgment signed until Trinity Term, after which the defendants, in Michaelmas Term, served the plaintiff with a rule to assign errors, and the plaintiff having assigned them, the defendants, in the same term, joined in error, and the case being afterwards argued, the judgment of the Court of Common Pleas was reversed. The Court of King's Bench, under these circumstances, refused to quash the writ of error, on the ground that it was returnable before costs were taxed in the court below, and consequently before any judgment was given in that court, as the defendant ought to have applied to quash it in an earlier stage of the proceedings." Citing *Den* v. *Roake,* 5 *Barn. & C.* 735, *note.*

In *Thompson* v. *Bowne,* 10 *Vroom* 2, our Supreme Court, upon an examination of the record returned with a writ of error, concluded that no judgment had as yet been actually entered, and therefore dismissed the writ as having been improvidently issued and returned, and this although manifest error appeared in the proceedings. So harsh a practice ought not to be followed (especially after joinder in error and consideration of the merits) unless the state of the return clearly requires it, else a mere mistake in form, for which the plaintiff in error is not responsible, may delay the reversal of an erroneous judgment or the affirmance of one that is free from error. And why should an erroneous judgment stand any the longer because it adds informality to error? · To so hold is simply to encourage loose practice in the entry of judgments.

In *Cooper* v. *Vanderveer,* 18 *Vroom* 178, it clearly appeared that the action in which the alleged error had been committed had not proceeded to its termination,· and the Supreme Court properly dismissed the writ of error. Chief Justice Beasley, however, in delivering the opinion, employed the phrase, "A writ of error will not run until the conclusion of the course of law in the court of first instance."

But in *Stein* v. *Goodenough,* 40 *Vroom* 635, it was pointed out by this court that by the later English practice the writ of error was permitted to be tested before judgment entered, in order that it might operate as a *supersedeas* in cases where execution was forthwith sued out; that even under this practice the writ was good only provided judgment was given before its return, and if it was returnable before judgment was entered it was quashed upon motion, and that this practice is prevalent in this state, and is recognized by that section of our Practice act (*Pamph. L.* 1903, *p.* 582, § 170) which provides that whenever any writ or other proceeding shall require the removal of the record of any judgment to any other court, the clerk shall record the judgment and the proceeding in the action in full.

In Stein *v.* Goodenough we retained the cause in order that the actual entry of judgment final might be procured and the record then brought up by *certiorari.* But in that case the

return showed that although rules entitling the defendant in error to judgment had been entered in the minutes, no judgment had been actually entered.

The present case differs, for here the return discloses not a mere minute or memorandum of the judgment that is to be entered, but the very entry of the judgment itself. The order sustaining the defendant's demurrer is certified to us by the Supreme Court as the record of the judgment called for by our writ of error. It may be presumed to have been entered in that form in the judgment book. Of course, such an entry is informal. The technical and proper form of a judgment sustaining defendant's demurrer to plaintiff's declaration, after reciting that it appears to the court that the declaration and the matters and things therein contained are not sufficient in law for the plaintiff to have and maintain his action thereof against the defendant, proceeds in substance as follows: "Therefore it is considered that the plaintiff take nothing by his said writ, and that the defendant go thereof without day," &c. And there follows a judgment for costs in the following form: "And it is further considered that the defendant do recover against the plaintiff [mentioning the sum] for his costs and charges by him about his defence in this behalf laid out and expended, by the court here adjudged to the defendant, with his assent, according to the form of the statute in such case made and provided, and that the defendant have execution thereof," &c. *Arch. Ap.* 299.

But the technical phrase *"ideo consideratum est"* is not necessary to constitute such a judgment as will support a writ of error. *Den d. Rutherford* v. *Fen,* 1 *Zab.* 700, 702.

Such a defect, being one of form merely, may be amended, if necessary, in this court. *Apgar's Administrators* v. *Hiler,* 4 *Zab.* 808; *Delaware, Lackawanna and Western Railroad Co.* v. *Toffey,* 9 *Vroom* 525, 526; citing *Hooper* v. *Lane,* 6 *H. L. Cas.* 443, 476, 489, 501, 555.

The common joinder in error, *in nullo est erratum,* amounts to an admission by defendant in error that what is returned as the record of the judgment under review is in truth the record thereof, so that after joinder in error neither

party can of right allege diminution or have a *certiorari.* 2 *Tidd* 1174; *Gilliland* v. *Rappleyea,* 3 *Gr.* 138, 145. Indeed, the common joinder ordinarily concludes with a prayer "that the judgment aforesaid, in manner aforesaid given, may in all things be affirmed." And such is the prayer of the defendant in this case. It involves a clear inconsistency to admit the defendant in error afterwards to move to quash the writ of error on the ground that no judgment has been returned.

It is true that notwithstanding the parties may thus be bound by their admissions, the court of review is not restrained from looking into the record, and may of its own motion award a *certiorari* to supply any defects in the body of the record or in its outbranches. Such was the course pursued by us in the case of Stein *v.* Goodenough, above cited.

But in the present case the judgment record, in the form in which it has been made up in the Supreme Court, and by that court returned to us, sufficiently imports a determination of the merits raised by the demurrer, and lacks only a precise ascertainment of the amount of costs. Of this imperfection defendant in error makes no complaint. If the judgment is to be affirmed, only defendant in error will be harmed by the omission of costs. If the judgment is to be reversed because erroneous on the merits, the judgment for costs would, of course, fall with it.

A judgment in favor of either party upon demurrer to a declaration is a final judgment reviewable on error. *Hale* v. *Lawrence,* 2 *Zab.* 72, 80.

Upon the whole, therefore, we see nothing in the exigencies of the present case to require that decision be delayed in order to enable the Supreme Court to perfect its judgment record and return the perfected record to us pursuant to a *certiorari.* For the purposes of a review we consider the judgment as returned sufficient in substance, and will treat it as if amended in this court with respect to the mere matter of form.

We proceed, therefore, to consider the case upon its merits.

The plaintiff's declaration sets forth that the defendant was engaged in the business of putting up in tin cans or vessels,

and vending, meats or ham for food and domestic use, and did put up a certain can of ham for food and domestic use which was sold by the defendant to a retail dealer to be sold to customers and patrons; that plaintiff purchased said can of ham from said retailer for food and domestic use; that the defendant "so carelessly, negligently, recklessly and improperly put up in said can of ham diseased, unfit and unwholesome pork or ham which was deleterious and poisonous to the human body and health, that the plaintiff after purchasing said can of ham, and without fault or negligence on her part, ate a piece of ham taken from said can, and, in consequence thereof, became poisoned and sick with ptomaine poison."

Defendant's demurrer raised certain formal objections that under the old practice could have been raised only by special demurrer, and are now available only on motion to strike out. *Central Railroad Co.* ads. *Van Horn,* 9 *Vroom* 133, 139; *Race* v. *Easton and Amboy Railroad Co.,* 33 *Id.* 536, 539; *Minnuci* v. *Philadelphia and Reading Railroad Co.,* 39 *Id.* 432; *Jackson* v. *Pennsylvania Railroad Co.,* 40 *Id.* 79; *Karnuff* v. *Kelch, Id.* 499. These objections the Supreme Court properly disregarded.

The only question properly raised by the demurrer, is whether upon the facts stated in the declaration, and in the absence of *scienter,* there is a liability on the part of the defendant. The Supreme Court held there was none, and this upon the ground that at common law, upon a sale of food or provisions by a manufacturer to a dealer, there is no implied warranty of wholesomeness; and that assuming a different rule exists in the case of a sale by such dealer to a consumer, yet the consumer, in the absence of a statute cannot hold the manufacturer or original vendor to a higher degree of duty than that cast upon him by common law with respect to his own vendee.

In our opinion the Supreme Court erred in making the question of defendant's liability turn upon the existence or non-existence of a warranty. Whether a warranty be express or implied, it is a matter of contract, rendering the maker liable in case of breach, notwithstanding he used all care to

prevent a breach, but rendering him liable in ordinary circumstances only to the party with whom he contracted, or to others for whose benefit the contract was made.

Assuming (without deciding) that there is no implied warranty on the part of the manufacturer of canned food that the goods shall be wholesome and fit to be eaten, it by no means follows that there is no duty resting upon the manufacturer to exercise care that the contents of the cans, which it puts upon the market to be sold for food and domestic use, are in fact food rather than poison.

In this state we have repeatedly held that where a duty arises solely out of a contract no one can bring an action for its breach unless he be a party to the contract or one for whose benefit it is made. *Marvin Safe Co.* v. *Ward,* 17 *Vroom* 19; *Styles* v. *Long Company,* 38 *Id.* 413, 417; same case at a later stage, 41 *Id.* 301; *Conklin* v. *Staats, Id.* 771.

But in these cases liability was denied upon the ground that, aside from the contract, there was no duty incumbent upon the defendant. In the case in 17 *Vroom,* Ward was subject to a contractual obligation to build a bridge in accordance with his contract, and was under no other duty. The contract was subject to modification and waiver as between the parties. In the Styles case, as reported in 38 *Id.,* it appeared that the trial judge had submitted to the jury the contractual obligation to light the footbridge, arising out of defendant's agreement with the board of freeholders, as forming in and of itself a sufficient basis for imposing upon the defendant the duty of exercising care towards the public, for breach of which duty the plaintiff, as one of the public, could maintain an action of tort, and that the stipulations of the contract were adopted as the sole criterion for determining what precautions were necessary to be taken by the defendant in order to fulfill the duty in question. It was held by the Supreme Court that this was error. In the case in 41 *Id.* it was held by this court that the contractual obligation created no liability toward the traveling public, and that the Long Company was not liable under the doctrine of invitation, because it was the county authorities who had invited the public

to use the bridge and not the bridge builder. In *Conklin v. Staats,* the scow that was damaged was berthed by the defendant at a place where there was a submerged pile, upon which the plaintiff's scow was impaled when the tide fell. There was no notice to the defendant of the existence of the submerged pile, but because defendant had contracted with a third party to remove all old piles it was contended that it thereby came under a general duty to the public, including the plaintiffs. This court held that the plaintiff, not being a party to that contract, could not maintain an action of tort in respect to the breach of a duty that arose solely from its provisions.

In *Styles v. Long Company,* 41 *Vroom* 302, Mr. Justice Swayze, speaking for this court, cited some distinguishable cases where the existence of the contract creates a situation that subjects the parties to duties that are independent of the obligation to perform the contract, instancing the duty of carriers of passengers (*Marshall v. York, &c., Ry. Co.,* 11 *C. B.* 655), the duty of a vendor of drugs (*Thomas v. Winchester,* 6 *N. Y.* 397), the duty of the vendor of a gun to a person for whom it was bought (*Langridge v. Levy,* 2 *Mees. & W.* 519; 4 *Id.* 337), the duty of a person who participates in the management of a highly dangerous agency·(*Van Winkle v. American Steam Boiler Co.,* 23 *Vroom* 240), the duty of a county clerk under the statute in canceling a mortgage (*Appleby v. Stale,* 16 *Id.* 161), as cases where the duty was held to be a positive duty independent of the contract, although arising out of a state of facts created by the contract.

Coming, then, to consider the facts of the present case as averred in the declaration, and dealing with them irrespective of the presence or absence of contractual obligations arising out of the dealings between manufacturer and retailer and between retailer and consumer, the question is whether the manufacturer is under a duty to him who in the ordinary course of trade becomes the ultimate consumer to exercise care that the goods which he puts into cans and sells to retail dealers, to the end that such dealers may sell the same to cus-

tomers and patrons as food, are wholesome and fit for food, and not tainted with poison.

Canned goods are at the present day in such common use that we may judicially recognize that the contents are sealed up, not open to the inspection or test either of the retailer or of the customer until they are opened for use, and not then susceptible to practical test, except the test of eating. When the manufacturer puts the goods upon the market in this form for sale and consumption he in effect represents to each purchaser that the contents of the can are suited to the purpose for which it is sold, the same as if an express representation to that effect were imprinted upon a label. Under these circumstances the fundamental condition upon which the common-law doctrine of *caveat emptor* is based—that the buyer should "look out for himself"—is conspicuously absent, for he has no opportunity to look out for himself. And when he thus buys and eats the contents of the package, relying upon the assurance of the manufacturer that they are fit to be eaten, it seems to us to result, from general and fundamental principles, that he has a right to insist that the manufacturer shall at least exercise care that they are so fit, and are not unwholesome and poisonous.

Among the most fundamental of personal rights, without which man could not live in a state of society, is the right of personal security, including "the preservation of a man's health from such practices as may prejudice or annoy it" (1 *Bl. Com.* 129, 134), a right recognized, needless to say, in almost the first words of our written constitution. *Const., art.* 1, ¶ 1. To assert, therefore, that one living in a state of society organized, as ours is, according to the principles of the common law need not be careful that his acts do not endanger the life or impair the health of his neighbor seems to offend against the fundamentals.

Upon what other fundamental principle does the rule rest that one who uses a highway must be careful not to collide with his neighbor? Upon what other fundamental principle does the law of libel and slander rest, or the rule recently laid down by this court in *Brennan* v. *United Hatters,* 44 *Vroom*

729, 744, that any act is wrongful which, in the ordinary course, will infringe upon the rights of another, to his damage, except it be done in the exercise of an equal or superior right?

In *Langridge* v. *Levy, supra,* plaintiff's father bargained with defendant to buy of him a gun for the use of himself and sons, and the defendant, by falsely and fraudulently warranting the gun to have been made by N., and to be a good, safe and secure gun, sold the gun to plaintiff's father, and the plaintiff, knowing and confiding in the warranty, used the gun, which in his hands, by reason of its weak, dangerous and insufficient construction and materials, burst, whereby plaintiff was injured. *Held,* by the Courts of Exchequer and of Exchequer Chamber, that the action was maintainable on the ground "that as there is fraud, and damage the result of that fraud, not from an act remote and consequential, but one contemplated by the defendant at the time as one of its results, the party guilty of the fraud is responsible to the party injured." This case of itself is of course not an authority closely in point with the case before us, for here there is no averment of fraud, but only of negligence. But in *George* v. *Skivington, L. R., 5 Exch.* 1, where the declaration alleged that the defendant carried on the business of a chemist, and in the course of his business professed to sell a chemical compound made of ingredients known only to him, and by him represented to be fit to be used for a hair wash, and the plaintiff J. G. thereupon bought of the defendant a bottle of this hair wash, to be used by his wife, the plaintiff E. G., as the defendant then knew, and averred that the defendant had negligently and unskillfully prepared the hair wash, so that by reason thereof it was unfit to be used for washing the hair, whereby the female plaintiff, who used it for that purpose, was injured. It was held by the Court of Exchequer on demurrer that a good cause of action was disclosed. This decision was based upon the authority of Langridge v. Levy, it being held that the duty was of a similar character, one of the barons saying, "Substitute the word 'negligence' for 'fraud,' and the analogy between Langridge

*v.* Levy and this case is complete." *Longmeid* v. *Holliday,* 6 *Exch.* 761, was distinguished, but upon grounds that are not very satisfactory. In the latter case it was held that a tradesman who contracts with an individual for the sale to him of an article to be used (in this instance a lamp) for a particular purpose by a third party is not, in the absence of fraud, liable for injury caused to such person by some defect in the construction of the article. In this case the declaration averred that there was a fraudulent representation that the lamp was safe, but of this there was no proof at the trial. There was no averment in the declaration of negligence on the part of the defendant in the manufacture of the lamp. The decision may perhaps be sustained upon this ground.

The leading American case is *Thomas* v. *Winchester,* 6 *N. Y.* 397 (1852). This is a well-considered case, and holds that a dealer in drugs and medicines who carelessly labels a deadly poison as a harmless medicine and sends it so labeled into market, is liable to all persons who, without fault on their part, are injured by using it as such medicine in consequence of the false label; that such liability arises not out of any contract or privity between the dealer and the person injured, but out of the duty which the law imposes upon the former to avoid acts in their nature dangerous to the lives of others.

This decision has been cited with approval by our Supreme Court as a typical instance of the duty imposed, on public grounds, upon any person who undertakes the performance of an act which, if not done with care and skill, will be dangerous to the persons or lives of others, the duty being to exercise such care and skill. *Van Winkle* v. *American Steam Boiler Co.,* 23 *Vroom* 240, 247. And this court has already approved Thomas *v.* Winchester to the extent that it held the chain of causation was not broken by the innocent acts of the intervening parties, who, in reliance upon the label, bought and sold the poison until it came to her who finally used it as a medicine. *Delaware, Lackawanna and Western Railroad Co.* v. *Salmon,* 10 *Id.* 299, 310.

The doctrine of Thomas *v.* Winchester has been recognized and approved in Massachusetts. See *Norton* v. *Sewall,* 106

*Mass.* 143, 144. And in *Bishop* v. *Weber,* 139 *Id.* 411 (1885), an action of tort was sustained against a caterer for improperly and negligently furnishing unwholesome and poisonous food. Justice Allen said: "This liability does not rest so much upon an implied contract as upon a violated or neglected duty voluntarily assumed. Indeed, where the guests are entertained without pay, it would be hard to establish an implied contract with each individual. The duty, however, arises from the relation of the caterer to the guests. The latter have a right to assume that he will furnish for their consumption provisions which are not unwholesome and injurious through any neglect on his part. The furnishing of provisions which endanger human life or health stands upon the same ground as the administering of improper medicines, from which a liability springs irrespective of any question of privity of contract between the parties."

In *Blood Balm Co.* v. *Cooper,* 83 *Ga.* 457 (1889), it was held upon the authority of Thomas *v.* Winchester that the proprietor of a patent medicine who puts upon the bottle containing it a prescription that it is to be taken in certain quantities, and sells it to a druggist for resale to any who may wish it, is liable for any injury sustained on account of its poisonous effect by one who buys it of the druggist and uses it according to the prescription. The court said: "The liability of the plaintiff in error to the person injured arises, not by contract, but for a wrong committed by the proprietor in the prescription and direction as to the dose that should be taken. We can see no difference whether the medicine was directly sold to the defendant in error by the proprietor or by an intermediate party to whom the proprietor had sold it in the first instance for the purpose of being sold again. It was put upon the market by the proprietor, not alone for the use of druggists to whom they might sell it, but to be used by the public in general, who might need the same for the cure of certain diseases, for which the proprietor set forth in his label the same was adapted. This was the same thing as if the proprietor himself had sold this medicine to

the defendant in error, with his instructions and directions as to how the same should be taken."

A recent Minnesota case—*Schubert* v. *J. R. Clark Co.*, 49 *Minn.* 331 (1892)—perhaps extends the doctrine of Thomas *v.* Winchester further than we need to go in the present case. There one Phelps had ordered a new stepladder from a retail merchant for the use of the plaintiff, who was a house-painter in the employ of Phelps. The merchant, not having such a ladder in his stock, ordered the defendant corporation to deliver such a ladder to the plaintiff for his use. Pursuant to this order defendant delivered a ladder to the plaintiff which was made of poor, cross-grained and decayed lumber, but was so painted that neither the plaintiff nor his employer nor the merchant could discover the defects. Plaintiff, supposing the ladder to have been made of good material, proceeded to use it in the performance of his work, when it broke under his weight and he was thereby injured. The liability was sustained.

*Craft* v. *Parker, Webb & Co.*, 96 *Mich.* 245 (1893), is a case more closely in point, and is, we deem, a reliable authority.

In *Huset* v. *J. I. Case Threshing Machine Co.*, 120 *Fed. Rep.* 865 (1903), the precise question was this: "Is a manufacturer or vendor of an article or machine which he knows, when he sells it, to be imminently dangerous, by reason of a concealed defect therein, to the life and limbs of anyone who shall use it for the purpose for which it was made and intended, liable to a stranger to the contract of sale for an injury which he sustains from the concealed defect while he is lawfully applying the article or machine to its intended use." Justice Sanborne, in the course of a somewhat elaborate opinion, approves *arguendo* the doctrine of Thomas *v.* Winchester, Bishop *v.* Weber, and other cases of that character.

In *Salmon* v. *Libby*, 219 *Ill.* 421 (1905), the declaration alleged in substance that the defendant prepared, put up in a package and sold to the trade, certain mince-meat, which in

the ·due course of business passed through the hands of a wholesale dealer, a retail dealer, and, "finally, was made into a pie, of which plaintiff's testator ate; that the defendant negligently and improperly prepared and manufactured the mince-meat in question; that as a result the same became unfit for food, and poisonous and destructive to human life when used as food, and that plaintiff's testator, lawfully partaking of the same, was poisoned and lost his life in consequence thereof. There was no averment of a *scienter*, the declaration counting upon negligence alone. The Supreme Court of Illinois held that this set forth a good cause of action under a statute permitting a recovery for the death of a person caused by the wrongful act or omission of another.

Upon both reason and authority we are clearly of the opinion that the declaration before us sets up a good cause of action. The fact that the defendant was the manufacturer, presumably having knowledge or opportunity for knowledge of the contents of the cans and of the process of manufacture; that it put the goods upon the market for sale by dealers to consumers under circumstances such that neither dealer nor consumer had opportunity for knowledge of the contents; the fact that the goods were thus manufactured and marketed under circumstances that imported a representation to intending purchasers that they were fit for food and beneficial to the human body; that in the ordinary course of business there was a probability (it being, indeed, the very purpose of the defendant) that the goods should be purchased, and used by parties purchasing, in reliance upon the representation, and that the defendant negligently prepared the food so that it was unwholesome and unfit to be eaten and poisonous to the human body, whereby the plaintiff was injured, make a case that renders the defendant liable for the damages sustained by the plaintiff thereby.

Let the judgment be reversed and the record be remitted to the Supreme Court, to the end that the defendant may apply there for leave to withdraw its demurrer and plead to the merits. See *Hale* v. *Lawrence*, 2 *Zab*. 72, 82.

*For affirmance*—None.

*For reversal*—PITNEY, CHANCELLOR, THE CHIEF JUSTICE, SWAYZE, REED, TRENCHARD, PARKER, BERGEN, BOGERT,. VREDENBURGH, VROOM, GREEN, GRAY, DILL, J.J.    13.