Day, J.
 

 This was an action for damages based on the negligence of the defendant in selling
 
 *779
 
 unwholesome meat to the plaintiff to be consumed as' food, the sale of which unwholesome meat was in violation of the law of the state.
 

 The jury, in response to an interrogatory submitted by the defendant, found that the veal roast purchased by plaintiff’s mother was unwholesome at the time it was sold to her by the defendant, and further found a general verdict in favor of the plaintiff below.
 

 Two questions are presented by the record: (1) Whether there is any evidence tending to support the special and general verdict of the jury. (2) Whether there is error in the trial court’s charge, wherein he instructed the jury: “The defendant’s ignorance of the condition of the veal at the time it was sold is no defense.”
 

 In ordér to determine the first question, a somewhat detailed statement of the facts upon which the cause of action is based is necessary.
 

 In the testimony of Mollie George, mother of Charles George, the record discloses as follows.
 

 “Q. Well, tell us what you observed about the roast? A. He brought it from the ice box. I told him I did not like it.
 

 “Q. What did you observe about it? A. It wasn’t fat. * * *
 

 “Q. What, if anything, was said by the clerk who produced that veal roast? A. He says, ‘It is fresh meat, ma’am.’.
 

 “Q. What were his words? A. It is fresh meat, ma’am.
 

 “Q. It is fresh.meat, ma’am? A. Yes, sir.
 

 “Q. What did he then do with it? A. He wrapped it up. * * *
 

 
 *780
 

 “Q.
 
 Well, after you paid for this meat and it was wrapped up, what did you do with it? A. I went home,
 

 “Q. What time of the morning was it? A. About 9 o’clock.
 

 “Q. What kind of weather was it, if you remember? A. ¡Cold, very cold.
 

 “Q. Did you go immediately home, or go somewhere else? A. No, sir; I went immediately right home.
 

 “Q. When you got home, what, if anything, did you do with that meat? A. Put it in salt water.
 

 “Q. In what? A. In an aluminum kettle.
 

 “Q.
 
 Where did you then put it? A. In the roast pan.
 

 “Q. No, after you put it in the aluminum kettle, what did you do with it? A. I washed it and put it in my roast pan. * * *
 

 “Q. What did you observe about that meat? A. It was blue looking.
 

 “Q.
 
 And as to having any fat on it, or otherwise, how was it? A. There wasn’t a speck of fat on it. * * *
 

 “Q. Now, when you took this veal roast out of your roaster, what did you notice about it? A. Well, it was very dark meat.
 

 “Q. Anything else you noticed? A. It was dark meat, and it fell apart.”
 

 Without going into further detail, the record shows that the meat in question was eaten by Charles E. George, by three boarders, and by the mother, Mollie George, all of whom were made sick, and that the symptoms of all of them were substantially the same.
 

 
 *781
 
 The witness Cnyler O. Johnson, who was one of the boarders, and an employee of the Goodyear Tire & Rubber Company, testified that he ate very little of the meat that night at supper, but took some to his work that night, a lunch, consisting of a couple of sandwiches, or one meat sandwich cut in half, with some of this meat in, and an apple. The witness went to his place of employment, and at about midnight ate the sandwich containing the meat claimed to be unwholesome. An hour later he became violently ill in the stomach, and was sent to the dispensary of the company, and later went to a doctor in 'South Akron, who caused him to vomit up lumps of meat which he had eaten. Johnson also developed many of the same symptoms which Charles George, the minor, sustained as a result of eating this so-called unwholesome meat, and testified that this condition continued for some time; that he had no such condition before eating this meat.
 

 There was testimony of medical experts introduced, the record disclosing in the testimony of Dr. George M. Logan the following:
 

 “Q. In your opinion, if you have an opinion, Doctor Logan, what was the thing which this boy ate which caused this discoloration? A. I will have to base that answer on the probability or frequency of the articles described in the diet containing the infection. The meat, of course, is the thing that infection develops in most - readily and most persistently. May I refresh my memory on what else he áte a.t this time ?
 

 “Q. He ate mashed potatoes, bread and butter, and a glass of water. That is. the boy, you mean? A. Yes.
 

 
 *782
 
 “Q. And he ate generously of the veal, having, perhaps, three helpings of it? A. None of those things besides the veal are good media in which bacteria develops. Meat is the ideal media in which bacteria develops.
 

 “Q. Then, in your opinion, if you have an opinion, what was it which he ate which caused the infection? A. The meat.”
 

 Other medical testimony was introduced by the plaintiff below along the same line, as appears by the testimony of Dr. Crafts:
 

 “A. I would again say that 95 out of 100 cases of botulinous infection came from meat.
 

 “Q. Well, in this case? A. In this case, I would say that meat would probably be the cause of infection.”
 

 C., H. & D. Ry. Co.
 
 v.
 
 Frye,
 
 80 Ohio St., 289, 88 N. E., 642, 131 Am. St. Rep., 709:
 

 “In civil cases the jury deals only with probabilities,” etc.
 

 Other testimony might be quoted from the record tending to substantiate the conclusion reached -by the jury, to wit, that the meat was unwholesome when sold.
 

 It is claimed, on the part of the plaintiff in error, that this conclusion is the foundation of an inference upon an inference, but from an examination of the entire record we are of opinion that even though the testimony of the medical experts is conflicting the jury were justified ini reaching the conclusion that the meat was unwholesome and caused the sickness of the plaintiff below and also of the various witnesses that testified in the case, and that this conclusion might well have been
 
 *783
 
 reached without basing aa inference' upon an inference.
 

 The record discloses that the meat was thoroughly prepared, and cooked in the ordinary manner for roasting veal, and we can see no contributory negligence as claimed by the plaintiff in error, but reach the conclusion that .by the ordinary methods of weighing the testimony and arriving at facts the verdict of the jury in this instance is sustained by competent evidence, and that the special verdict in which they found that the meat was unwholesome cannot be said to be sustained by no evidence.
 

 The first ground of error claimed by the plaintiff in error must therefore be denied.
 

 This brings us to the second question in the case, whether the trial court erred in his instructions to the jury when he said in his charge:
 

 “A violation of this law by the defendant is negligence. It is known as negligence
 
 per se.
 
 Whether or not the defendant intended to violate the law does not make any difference. Whether the defendant or its servant knew that the veal was unwholesome, if it was unwholesome at the time it was sold, makes no difference. Lack of intent to violate the law is no defense to the defendant. The defendant’s ignorance of the condition of the veal at the time it was sold is no defense.”
 

 By the pure food laws of this state it is provided in Section 12760, General Code, as follows:
 

 “Whoever sells, offers for sale or has. in possession with intent to sell, diseased, corrupted, adulterated or unwholesome provisions without making the condition thereof known to the buyer,
 
 *784
 
 shall be fined not more than fifty dollars or imprisoned twenty days, or both.”
 

 If this statute was violated, was the violation negligence
 
 per se?
 

 As originally enacted in 1831 (29 Ohio Laws, 152), the element of knowledge was included in the statute, which read as follows:
 

 “That if any buteher or other person, shall
 
 knowmgly
 
 sell any unwholesome flesh of a diseased animal, or other unwholesome provision; he or she shall, upon conviction thereof, be fined in any sum not exceeding fifty dollars.”
 

 In 1896 this statute was amended (92 Ohio Laws, 97), as a result of which the element of knowledge on the part of the seller was eliminated. The cognate section, Section 5778, General Code, originally passed in 1884, 81 Ohio Laws, 67, was before this court in the ease of
 
 State
 
 v.
 
 Kelly,
 
 54 Ohio St., 166, 43 N. E., 163, wherein it was held:
 

 “1. An affidavit to charge a violation of the Act of March 20, 1884 (Section 8805, Giauque’s IRevised Statutes), ‘to provide against the adulteration of food and drugs,’ need not charge that an adulterated article of food is sold to be used .as human food.
 

 “2. In a prosecution under said act, it is not •a defense that the accused is ignorant of the adulteration of the article which he sells or offers for sale.”
 

 In the body of the opinion, Shauck, J., speaking for the court, said, at page 180, 43 N. E., 164:
 

 “In the enactment of this statute it was the evident purpose of the General Assembly to protect '(the public against the harmful consequences of the
 
 *785
 
 sales of adulterated food and drugs, and, to the end that its purpose might not be defeated, to require the seller at his peril to know that the article which he offers for sale is not adulterated.”
 

 This doctrine has been followed in this state in other cases:
 
 Meyer
 
 v.
 
 State,
 
 10 C. C., 226, affirmed 54 Ohio St., 242, 43 N. E., 164;
 
 Davis
 
 v.
 
 Guarnieri,
 
 45 Ohio St., 470, 15 N. E., 350, 4 Am. St. Rep., 548; and
 
 Edelstein
 
 v.
 
 Cook,
 
 108 Ohio St., 346, 140 N. E., 765, 31 A. L. R., 1333. While it is claimed by plaintiff in error that these cases are not in point, yet we‘ feel that the principle involved is the same. The doctrine is likewise recognized in other jurisdictions, but it is needless to multiply authorities upon that point. ,
 

 In the ease of
 
 Allen
 
 v.
 
 Marvin, Admr.,
 
 46 W. L. B., 208, the record discloses that Minnie Marvin, the decedent, purchased from James S. Allen some ham, and upon eating the same was taken sick and died, and her husband, as administrator, brought an action in damages to recover. The answer of Allen was a general denial, with a further defense that, if the decedent died as a result of the eating of the ham, she contributed to her own injury by eating the meat in an uncooked state. Relative to the pure food laws of the state, which it was charged Allen violated in selling the ham in question, the able and experienced trial judge gave the following instructions to the jury:
 

 “This act before spoken of, in relation to pure food, as well as the common law of this state, has placed upon the seller of meats the burden of duty in relation to its purity and' freedom from disease, in effect amounting to a warranty that
 
 *786
 
 it is not diseased, and the buyer has the right to place some reliance on the soundness of meat purchased from said seller. And this conclusion that the law makes will be considered by you in connection with all the other matters in determining this question of the claimed negligence of Mrs. Marvin.”
 

 The court further charged the jury upon the question of the contributory negligence of .Minnie Marvin, the decedent, and the jury rendered a verdict in favor of thé defendant. The case was taken to the Circuit Court on error, where the judgment below was reversed, on the ground that:
 

 “The court erred in its charge to the jury, in which it charged the jury that the question of contributory negligence on part of plaintiff, as to whether she used due caution or ordinary care in eating the meat in a raw or partly cooked state, was a question for the jury; that, there being no proof . showing that said Minnie . Marvin had knowledge of the meat in question being diseased, it was not negligence on her part to eat the same.”
 

 On error to the Supreme Court, the judgment of the Circuit Court was reversed, and that of the common pleas affirmed.
 
 Allen
 
 v.
 
 Marvin, Admr.,
 
 64 Ohio St., 608, 61 N. E., 1139.
 

 The question of knowledge- as a defense to the sale of unwholesome meat in violation of law was directly before this court in
 
 State
 
 v.
 
 Roach,
 
 87 Ohio St., 527, 102 N. E., 1132, wherein the defendant in error Roach had been charged with the sale of unwholesome meat. The trial court charged that if the accused did not know the meat was un
 
 *787
 
 wholesome the jury should return a verdict of not guilty, and instructed the jury:
 

 “You must bring knowledge home to the defendant that he did not act innocently or accidently, or sell by mistake, but that he knew the pork was diseased and sold it knowingly at the time; that is, knowing that it was so diseased, corrupted, or unwholesome.”
 

 Upon exceptions of the prosecuting attorney to this court, the same were sustained by unanimous concurrence, upon the authority of
 
 State
 
 v.
 
 Kelly,
 
 54 Ohio St., 166, 43 N. E., 163, and the charge as given held
 
 not
 
 to be the law.
 

 We think the evidence in this case shows a violation of the pure food law as covered by the provisions of Section 12760, General Code, and that the doctrine announced in this court in
 
 Schell
 
 v.
 
 DuBois, Adm’r,
 
 94 Ohio St., 93, 113 N. E., 664, applies in the present instance; that is, that “the violation of a statute passed for the protection of. the public is negligence
 
 per se,
 
 and, where such act of negligence by a defendant is the direct and proximate cause of an injury not directly contributed to by the injured person, the defendant is liable.” The sections of the Code under consideration in
 
 Schell
 
 v.
 
 DuBois, supra,
 
 and those in the case at. bar, are both passed for the protection of the public, and like principles should apply.
 

 Our attention is called to a number of cases involving questions where food is sold in cans, and also to the sale of unwholesome food in dining cars, restaurants, hotels, and so on, but it must be borne in mind that the claimed unwhole
 
 *788
 
 some meat sold in. the case at bar was open, exposed, and readily observable by the seller, who knew all about its origin and care, while in its possession, and hence does not come within the objections that are urged in. the class of cases last above mentioned. We therefore do not express opinion touching the merits of a controversy that may arise wherein such cases may have more apt application.
 

 We think the matter is well put, in so far as the facts of this case are concerned, in the case of
 
 Kelley
 
 v.
 
 John R. Daily Co.,
 
 181 P., 326, (56 Mont., 63), which was an action for damages resulting from defendant’s selling impure food, to wit, meat, in violation of law, where plaintiff was 37 years of age, in good health, and as a result of eating the unwholesome meat contracted bodily ailments mid became practically a nervous wreck, where a, recovery of $10,000 was allowed as not out of proportion to the extent of the injury. In that case it was held:
 

 “The Pure Pood and Drug Act is a general police regulation, recognizing that the. sale of adulterated foodstuff is a constant menace to the health of the consuming public, and the duty it enjoins upon the seller is such that a violation thereof renders him liable for special damages sustained by the consumer.
 

 “A complaint, alleging that at the time of the sale of impure food by defendant to plaintiff defendant was engaged in selling at retail, to the public generally, meat and meat products for human consumption, is sufficient to bring the case within the statute, and disclose the duty defendant
 
 *789
 
 owed to the public, including plaintiff, to see that its food products offered for sale were not adulterated, within the meaning of such statute.”
 

 In further support of this doctrine may be cited the following cases, arising on various facts, but through all of which runs the general principle of the liability of the seller or manufacturer:
 
 Mazetti
 
 v.
 
 Armour & Co.,
 
 75 Wash., 622, 135 P., 633, 48 L. R. A., (N. S.), 213;
 
 Wilson
 
 v.
 
 J. G. & B. S. Ferguson Co.,
 
 214 Mass., 265, 101 N. E., 381;
 
 Tomlinson
 
 v.
 
 Armour & Co.,
 
 75 N. J. Law, 748, 70 A., 314, 19 L. R. A., (N. S.), 923;
 
 Parks
 
 v.
 
 C. E. Yost Pie Co.,
 
 93 Kan., 334, 144 P., 202, L. R. A., 1915C, 179;
 
 Ketterer
 
 v.
 
 Armour & Co.,
 
 (D. C.), 200 F., 322;
 
 Meshbesher
 
 v.
 
 Channellene Oil & Mfg. Co.,
 
 107 Minn., 104, 119 N. W., 428, 131 Am. St. Rep., 441;
 
 Davis
 
 v.
 
 Van Camp Packing Co.,
 
 89 Iowa, 775, 176 N. W., 382 (a well-considered case, and extensively annotated in 17 A. L. R., 649, 689);
 
 Flessher
 
 v.
 
 Carstens Packing Co.,
 
 93 Wash., 48, 160 P., 14. In the opinion of the court in the last-named case this language is pertinent:
 

 “Whether the action be called one on warranty or of negligence it comes to the same thing. It sounds in tort. * * * The negligence consists in offering stuff not known to be wholesome for sale, to the purchaser’s injury.”
 

 Our conclusion is that there was no error in the charge of the trial court in the matter complained of; that this construction of the pure food laws of this state has been heretofore recognized by this court. The jury having found that the meat complained of was unwholesome when sold to the plaintiff’s mother for his immediate consump
 
 *790
 
 tion, and such sale constituting a violation of the pure food laws of Ohio, and such violation, in the light of
 
 Schell
 
 v.
 
 DuBois, Adm’r, supra,
 
 being negligence
 
 per. se,
 
 therefore the instruction of the trial court, that “the defendant’s ignorance of the condition of the veal at the time it was sold is no defense,” was not erroneous.
 

 An examination of this voluminous record, assisted by the able arguments and exhaustive briefs of counsel, impresses us that the case was fairly tried in the court of common pleas, and carefully reviewed in the Court of Appeals, and that the judgment of those courts should be affirmed.
 

 Judgment affirmed.
 

 Marshall, O. J., Robinson, Jones, Matthias, Allen, and Conn, JJ., concur.