Tart, J.
This court has held in effect that where, as in the
instant case, a patron of a restaurant orders a meal and it is served to him, there is a sale of what is served by the restaurant to the patron, and, by reason of that portion of the Uniform Sales Act that is now Section 1315.16, Revised Code,[1] the operator of the restaurant impliedly warrants that the food is reasonably fit to eat. Yochem v. Gloria, Inc., 134 Ohio St., 427, 17 N. E. (2d), 731. See annotation 7 A. L. R. (2d), 1027, *251 and annotation 18 NCCA (NS), 573. We have further held in effect that a violation of our statutes, making it a crime to sell “food * * * that is adulterated,”[2] constitutes negligence per se. Yochem v. Gloria, Inc., supra (134 Ohio St., 427), Portage Markets Co. v. George, 111 Ohio St., 775, 146 N. E., 283, Taugher v. Ling, 127 Ohio St., 142, 187 N. E., 19, Great Atlantic & Pacific Tea Co. v. Hughes, 131 Ohio St., 501, 3 N. E. (2d), 415, Rubbo v. Hughes Provision Co., 138 Ohio St., 178, 34 N. E. (2d), 202, Leonardi v. A. Habermann Provision Co., 143 Ohio St., 623, 56 N. E. (2d), 232, Kurth, Admx., v. Krumme, 143 Ohio St., 638, 56 N. E. (2d), 227, Wolfe v. Great Atlantic & Pacific Tea Co., 143 Ohio St., 643, 56 N. E. (2d), 230. As a result, whether there would be liability in Ohio, apart from statute, for a sale of food that is unfit to eat because it contains something (like the oyster shell in the instant case) that is not edible is a question of only academic interest. Thus, if such food so sold is unfit to eat, its sale will usually amount to a breach of an implied warranty or to negligence per se; and it will then be unimportant to consider whether, apart from statute, the defendant would be liable for negligence in the sale of such food if he knew or, in the exercise of ordinary care, should have known that it was unfit to eat. See 22 American Jurisprudence, 881, Section 97. If such food was reasonably fit to eat, it is difficult to see how the defendant could, apart from violation of some statute, ever be said to be negligent in selling it for food.
As we view it therefore, whether plaintiff’s petition sets forth a cause of action depends upon whether the presence in *252 one fried oyster of a serving of sis of a piece of shell, such as described in the petition, will justify a legal conclusion either (a) that that serving of fried oysters constituted “food” that was “adulterated” within the meaning of Section 3715.59, Revised Code, or (b) that that serving constituted food not “reasonably fit for” eating.
It is obvious that a piece of shell such as described in the petition can be readily removed from a fried oyster by anyone who is going to eat it; and that, if it is so removed, the fried oyster would then admittedly be food that is fit for eating arid that is not “adulterated.” A different problem would be presented if the shell had been shattered into smaller pieces which could not be readily removed from the oyster so as to leave any substantial edible portion that was free from such pieces. In the latter instance, a contention, that the oyster would constitute “adulterated” food or food not reasonably fit for eating, might be more persuasive.
Of course, a piece of shell, such as described in the petition, is not reasonably fit for eating as food; and, if eaten with food, it could have a “deleterious” effect. However, the same could be said about a peach seed in a peach, a plum seed in a plum, a cherry seed in a cherry, a skewer or toothpick or even string-used to hold meat together, and bones in a steak or in a piece of chicken or in fish. However, the great weight of authority would not allow recovery for damages in such instances.
Thus, in the leading case of Mix v. Ingersoll Candy Co. (1936), 6 Cal. (2d), 674, 59 P. (2d), 144, where it was alleged that a “chicken pie * * * contained ‘a dangerous, harmful and injurious subject, to wit, a sharp and pointed fragment and/or sliver of chicken bone * * * highly injurious to anyone eating-said chicken pie,’ ” it was held as a matter, of law that there could be no recovery ‘ ‘ no matter how the pleading was drawn. ’ ’ In the opinion by Curtis, J., it is said:
“It may well happen in many cases that the slightest deviation from perfection may result in the failure of the food to be reasonably fit for [see Cavanaugh v. F. W. Woolworth Co. (1941), 308 Mass., 423, 32 N. E. (2d), 256] human consumption. On the other hand * * * in certain instances a deviation from perfection, particularly if it is of such a nature as in common *253 knowledge could be reasonably anticipated and guarded against by the consumer, may not be such a defect as to result in the food being not reasonably fit for human consumption.
“* * * yye have examined a great many cases dealing with the question of the liability of restaurant keepers which arose out of the serving of food which was held to be unfit for human consumption, and we have failed to find a single case * * # in which a court has extended the liability based upon an implied warranty of a restaurant keeper to cover the presence in food of bones which are natural to the type of meat served. All of the cases are instances in which the food was found not to be reasonably fit for human consumption, either by reason of the presence of a foreign substance, or an impure and noxious condition of the food itself, such as for example, glass, stones, wires or nails in the food served, or tainted, decayed, diseased, or infected meats or vegetables. Although it may frequently be a question for a jury as the trier of facts to determine whether or not the particular defect alleged rendered the food not reasonably fit for human consumption, yet certain cases present facts from which the court itself may say as a matter of law that the alleged defect does not fall within the terms of the statute. * * * as a matter of common knowledge chicken pies occasionally contain chicken bones. We have no hesitancy in so holding, and we are of the opinion that despite the fact that a chicken bone may occasionally be encountered in a chicken pie, such chicken pie, in the absence of some further defect, is reasonably fit for human consumption. Bones which are natural to the type of meat served cannot legitimately be called a foreign substance, and a consumer who eats meat dishes ought to anticipate and be on his guard against the presence of such bones. * * * the application of the rule of implied warranty might impose a heavy burden upon the keeper of restaurants # * # but * * * considerations of public policy and public health and safety are of such importance as to demand that such obligation be imposed. This is true, but we do not believe that the onerous rule should be carried to absurd limits. Certainly no liability would attach to a restaurant keeper for the serving of a T-bone steak, or a beef stew, which contained a bone natural to the type of meat served, or if a fish dish should contain a fish bone, or if a cherry pie *254 should contain a cherry stone — although it be admitted that an ideal cherry pie would be stoneless. * * *
“With reference to the count based upon negligence, the same logic and reasoning apply. * * * We do not believe it is a question of contributory negligence on the part of the customer, but a question of whether or not a restaurant keeper in the exercise of due care is required to serve in every instance a perfect chicken pie, in that all bones are entirely eliminated. If the customer has no right to expect such a perfect product, and we think he is not so entitled, then it cannot be said that it was negligence on the part of the restaurant keeper to fail to furnish an entirely boneless chicken pie.”
That case was followed in Silva v. F. W. Woolworth Co. (1938), 28 Cal. App. (2d), 649, 83 P. (2d), 76, denying liability on account of a small bone in turkey dressing. See also Lamb v. Hill (1952), 112 Cal. App. (2d), 41, 245 P. (2d), 316.
In Brown, Admx., v. Nebiker (1941), 229 Iowa, 1223, 296 N. W., 366, it is said in the opinion by Mitchell, J. :
“In the case at bar, the meat served was pork chops. There are bones in all pork chops. * * * certainly small bones in a pork chop are not a foreign substance to the pork chop.
‘ ‘ One Avho eats pork chops, or the favorite dish of spareribs and sauerkraut, or the type of meat that bones are natural to, ought to anticipate and be on his guard against the presence of bones, Avhich he knows will be there. The lower court was right in directing the verdict * * *.”
In Goodwin, Admr., v. Country Club of Peoria (1944), 323 Ill. App., 1, 54 N. E. (2d), 612, where it was held that a verdict should have been directed in an action for wrongful death “occasioned from swallowing a bone * * * while eating creamed chicken, ” it is said in the opinion by Huffman, J.:
“We do not believe the rule as established in this jurisdiction, exceeds an implied warranty that food served shall be Avholesome and fit to be eaten * * * such rule should be construed and applied in a reasonable manner, taking into consideration the common experience of life. When viewed in this light, it must be conceded that practically all meat dishes, whether they consist of beef, pork, fish or fowl, do contain bones peculiar to the food being served.”
*255 In Norris v. Pig’n Whistle Sandwich Shop, Inc. (1949), 79 Ga. App., 369, 53 S. E. (2d), 718, it is said in the opinion by Sutton, C. J.:
“A particle of bone in a food prepared from meat is something which one might ordinarily expect to find in the food, and one should anticipate its presence and guard against possible injury from swallowing it. * * * the defendant was not required, in the exercise of ordinary care, to discover and eliminate every single particle of bone from the barbecued-pork sandwich, and the mere presence of a particle of bone in the sandwich does not authorize an inference of negligence in preparing and furnishing the food to the plaintiff.
‘ ‘ * * * Certainly it was not the intent of our lawmakers to deem an article of food, containing meat, adulterated merely because it contained portions of the animal which were inedible, but which did not render such food unfit for its intended consumption. Otherwise numerous articles of food which necessarily contain inedible portions of animal matter would be deemed adulterated. Numerous meats and fish are normally prepared which contain bone and other inedible matter indigenous to the animal from which the food is derived, yet these articles of food could not be deemed adulterated. * * * defendant cannot be said to be guilty of negligence per se in violation of this statute so as to require the submission of the case to a jury.”
In Courter v. Hilbert Bros., Inc. (App. Div. — 1958), 186 N. Y. Supp. (2d), 334, which held that there was no cause of action for damages caused by a prune pit in prune butter, it is said in the opinion by Di Giovanna, J.:
“The prune pit was not an adulteration of food because it is neither poisonous nor deleterious in its nature * * *. Certainly a product natural to the prune itself cannot be considered an adulteration within the meaning of Section 199.”
In Shapiro v. Hotel Statler Corp. (DC, SD Cal. — 1955), 132 F. Supp., 891, it is said in the opinion by Jertberg, J.:
“Since it is the view of this court that the fish bone which lodged in plaintiff’s throat was natural to or its presence might reasonably be anticipated in ‘Hot Barquette of Seafood Mornay,’ it would necessarily follow that * * * he could not have recovered damages * *
*256 In Cavalier Vending Corp. v. United States (CCA4 — 1951), 190 F. (2d), 386, where a judgment condemning candy, chewing gum and metal plastic trinkets contained in vending machines was reversed, it is said in the opinion by Parker, C. J.:
“The finding of adulteration was based upon the idea that the mingling of the trinkets with the gum and candy resulted ‘in an indistinguishable mass of food’ which contained the trinkets within the meaning of Section 402 (a) (1) of the act * * * which provides that food shall be deemed adulterated ‘if it bears or contains any poisonous or deleterious substance which may render it injurious to health.’ The plastic or metallic trinkets would be injurious to health if swallowed or caught in the air passages of the nose or throat.
“We think it perfectly clear, however, that the trinkets, which correspond to the ‘prizes’ contained in the candy ‘prize boxes’ of an earlier day, are not contained within the gum or candy within any possible meaning of the act. If we look to its language, the deleterious subject must be contained within the food product offered for sale, and the trinkets are not contained in the pieces of gum or candy but are merely sold along with them. Neither the gum nor the candy contains the trinkets but is contained along with the trinkets in the bowl of the vending machine. The purpose of the statute is to prevent adulteration, i. e., the ‘adding to articles of food consumption poisonous and deleterious substances which might render such articles injurious to the health of consumers.’ ”
In United States v. 1232 Cases American Beauty Brand Oysters (DC, WD Mo. — 1942), 43 F. Supp., 749, where it was held that the government could not condemn certain cases of oysters containing shell fragments as adulterated food under a definition thereof identical with that contained in Section 3715.59 (A) (1), Revised Code, it is said in the opinion by Reeves, J.:
“No one who has had the experience of eating either fish or oysters is unfamiliar with the presence of bones in the fish (a deleterious substance) and fragments of shell in the oysters (also a deleterious substance).
“The Congress, however, withdrew such foods from the adulterated class ‘if the quantity of such substance in such *257 food does not ordinarily render it injurious to health.’
ÍÍ* # #
“* # * to reject oyster products as a food is unthinkable. It would be as reasonable to reject fish because of the presence of bones. * * *
< < * * *
“ * * * the presence of shell fragments in the article sought to be condemned does not ordinarily render it injurious to health.”
See also Wieland v. C. A. Swanson & Sons (CCA2 — 1955), 223 F. (2d), 26 (where judicial notice taken of “fact that a chicken contains many small bones less than an inch in length”).
Of the cases relied upon by plaintiff, some are clearly distinguishable from the instant case. Thus in Paolinelli v. Dainty Foods Manufacturers, Inc. (1944), 322 Ill. App., 586, 54 N. E. (2d), 759, where recovery was allowed for a chicken bone in chicken noodle soup mix used in preparing soup for a baby, the questions whether such soup mix with a bone in it would be adulterated food or food unfit to eat, were not even mentioned by the court. As to Gimenez v. Great Atlantic & Pacific Tea Co. (1934), 264 N. Y., 390, 191 N. E., 27, as stated in Dickerson, Products, Liability and the Food Consumer (1951), 187, Section 4.3, “the decision is perplexing because the question of wholesomeness was not fully discussed by the court and it is not clear what specific legal principles the court had in mind. ’ ’ Actually, the report does not even indicate that any question as to fitness of the food for eating was raised by the facts or presented to the court for consideration. The same may be said with respect to Roseberry v. Wachter (1925), 33 Del., 253, 138 A., 273, which is not the report of a decision of a reviewing court but merely the report of the charge of a trial court to the jury without even any indication as to the result of the trial.
In Wood v. Waldorf System, Inc. (1951), 79 R. I., 1, 6, 83 A. (2d), 90, it is said in the opinion by Flynn, C. J.:
“* * * the kind of soup served here is not to be compared with food which normally contains an obvious bone, or that ordinarily is expected by the customer to have a bone or bones therein, such as certain steaks, chops or fish. * * * where the food served is to be ingested more by drinking or by direct *258 swallowing without mastication, and the presence of a harmful bone is not usually to be expected by the customer and is concealed from ordinary observation, such a bone potentially can be as harmful as either of the foreign substances in the above-mentioned cases [broken glass and wire].
urn # *
“The cases relied upon by defendant do not concern such liquid types of food as here * * V’
We have some doubt as to whether this suggested distinction of the cases, that deny liability and to which we have previously referred, is a substantial distinction. Furthermore, we cannot reconcile those cases denying liability with the majority opinion and decision in Bonenberger v. Pittsburgh Mercantile Co. (1942), 345 Pa., 559, 28 A. (2d), 913, 143 A. L. R., 1417 (see criticism of that case in 17 Temple Law Quarterly, 228); and that case apparently is not in accord with the weight of authority. As the dissenting opinion therein suggests, that decision extends the liability of a seller of food “to absurd limits.”
We are inclined to agree with the statement in Dickerson, Products, Liability and the Food Consumer (1951), 185, Sections 4.2 and 4.3, that reads:
“Insofar as these cases rest on the notion of ‘naturalness’ in the sense that nothing that is an inherent part of the raw product itself can be a legal defect, they do not hold water. * * * “The better test of what is legally defective appears to be what consumers customarily expect and guard against.”
However, as that author points out at page 186, some of the cases on this problem “have adopted the consumer-expectation approach as a supporting rationale * * * on the assumption that anything that is natural to the product is in fact anticipated by the consumer.”
In the instant case, it is not necessary to hold, as some of the above-cited cases do, that, because an oyster shell is natural to an oyster and thus not a substance “foreign” to an oyster, no liability can be predicated upon the sale of a fried oyster containing a piece of oyster shell. However, the fact, that something that is served with food and that will cause harm if eaten is natural to that food and so not a “foreign substance,” will usually be an important factor in determining *259 whether a consumer can reasonably anticipate and guard against it. See Arnaud’s Restaurant, Inc., v. Cotter (CCA5 — 1954), 212 F. (2d), 883 (recovery allowed where crab meat not used in preparation of fish dish and piece of crab shell found in such dish), Lore v. De Simone Bros. (1958), 172 N. Y. Supp. (2d), 829. Our General Assembly specifically recognized it as an important factor in determining whether the presence of such item in food will constitute an adulteration thereof. See the portion of Section 3715.59 (A) (1) after the semicolon, supra, footnote 2.
In our opinion, the possible presence of a piece of oyster shell in or attached to an oyster is so well known to anyone who eats oysters that we can say as a matter of law that one who eats oysters can reasonably anticipate and guard against eating such a piece of shell, especially where it is as big a piece as the one described in plaintiff’s petition.
It is our conclusion that the presence in one of a serving of six fried oysters of a piece of oyster shell “approximately 3x2 centimeters in diameter” will not justify a legal conclusion either (a) that that serving of fried oysters constituted “food” that was “adulterated” within the meaning of Section 3715.59, Revised Code, or (b) that that serving constituted food not “reasonably fit for” eating.
It follows that the judgment of the Court of Appeals must be reversed and that of the Common Pleas Court affirmed.

Judgment reversed.

Zimmerman, Herbert and Peck, JJ., concur.
Weygandt, C. J., Matthias and Bell, JJ., dissent.

This statute reads so far as pertinent:
“* * * there is no implied warranty * * * as to the quality or fitness for any particular purpose of goods supplied under a contract to sell or a sale, except as follows:
“(A) When the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller’s skill or judgment, whether he is the grower or manufacturer or not, there is an implied warranty that the goods shall be reasonably fit for such purpose.” (Emphasis added.)

Section 3715.52, Revised Code, reads so far as pertinent:
“The following acts and the causing thereof are hereby prohibited:
“(A) The manufacture, sale, or delivery, holding or offering for sale of any food, drug, device, or cosmetic that is adulterated * *
Section 3715.59, Revised Code, reads so far as pertinent:
“Food is adulterated within the meaning of Sections 3715.01 and 3715.52 to 3715.72, inclusive, of the Revised Code, if:
“(A) (1) It bears or contains any poisonous or deleterious substance which may render it injurious to health; but in case the substance is not an added substance such food shall not be considered adulterated under this clause if the quantity of such substance in such food does not ordinarily render it injurious to health * *
(Emphasis added.)