## BOSTON & M. R. R. v. STEWART.

(Circuit Court of Appeals, First Circuit. December 6, 1918.)

### No. 1345.

TRIAL ⊜⇒232(3)—INSTRUCTIONS—DUTIES OF JURY.

An instruction approved that, while a juror should not lightly surrender an opinion which he conscientiously holds, when he finds himself in minority he should stop and consider whether he is more likely to be surely right than the majority upon a question about which there can be no absolute certainty.

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Error to the District Court of the United States for the District of New Hampshire; Edgar Aldrich, Judge.

Action at law by Thomas Stewart against the Boston & Maine Railroad. Judgment for plaintiff, and defendant brings error. Affirmed.

See, also, 241 Fed. 991, 154 C. C. A. 663.

Edward K. Woodworth, of Concord, N. H. (Streeter, Demond, Woodworth & Solloway, of Concord, N. H., on the brief), for plaintiff in error.

Alexander Murchie, of Concord, N. H. (Hollis & Murchie, of Concord, N. H., on the brief), for defendant in error.

Before BINGHAM and JOHNSON, Circuit Judges, and MORTON, District Judge.

JOHNSON, Circuit Judge. The defendant in error, hereinafter called the plaintiff, suffered a very severe injury at Manchester, N. H., on October 6, 1914, which resulted in the loss of one leg below and the other above the knee, by reason, as he alleged, of the negligence of the plaintiff in error, hereinafter called the defendant. He was employed in the dye house of the Amoskeag Manufacturing Company, and had left his home a little before 7 o'clock in the morning to go to his work, and while on his way through the yard of the Amoskeag Company was using a part of the track of the defendant company, where the space between the rails was planked over and used by employés of the Amoskeag Company in passing to and from their places of employment. He was proceeding toward the north, and had reached a point in the vicinity of the northwest corner of the boiler house of the Amoskeag Company when he saw a shifting train, composed of an engine and several cars, coming south on the same track on which he was walking. He testified that when the engine was within about 100 feet from him he attempted to step from the track over the east rail, but that his left foot was caught and securely held by what he thought at the time was a switch; and, although he claimed he shouted, he did not attract the attention of the engineer or the fireman on the engine, both of whom testified that they did not see him and did not know an accident had occurred until after they had stopped the train upon a signal from one of the trainmen.

The negligence alleged by the plaintiff was the failure of those operating the train to discover his situation and stop the train before it reached him. The plaintiff introduced the evidence of two witnesses who saw him just before the accident when he was trying to extricate his foot, and one of whom started to go to his assistance, but did not reach him before the accident happened.

The defendant claimed that the plaintiff was not injured because his foot was caught, but that he was struck by one of the cars of the passing train as he attempted to pass between the train and a railing at the northwest corner of the boiler house; that the distance between this railing and a large freight car was only about 3 inches, and that the plaintiff was struck at this point by a wide car—a Pennsylvania Railroad car—and knocked down under the wheels of that car. It intro-

duced evidence to show that the plaintiff was not upon the track in front of the engine as the train approached, but had reached the railing at the corner of the boiler house after the engine went by and several cars had passed; the Pennsylvania Railroad car being the thirteenth car in the train from the engine. It became, then, a disputed question of fact whether the plaintiff received his injuries as he claimed, or whether they were the result of his own lack of care in placing himself where he could be struck by one of the passing cars.

There was no switch near the northwest corner of the boiler house and the maximum distance here between the planking and the east rail was 2½ inches, which was the exact width of the heel of the shoe worn by the plaintiff at the time of the accident; but the sole of his shoe was 3⅞ inches wide. South of the northwest corner of the boiler house there was a guard rail next the east rail, the distance between which and the east rail was much wider than between the planking and the rail.

The case was tried twice in the District Court, and at the first trial a verdict was returned for the defendant, which was set aside and a new trial granted by the trial judge because of newly discovered evidence. At the second trial the plaintiff testified that he thought he was a little north of the corner of the boiler house at the time of the accident; that he thought his foot was caught in a switch, but could not swear to it; that he thought the whole of his foot was caught, but was not certain, but that it was firmly held, so that he could not move it. On cross-examination, when shown a photograph of the tracks and seeing there was no switch near the northwest corner of the boiler house, he testified as follows:

"And when you first told about this accident, and for some time afterwards, you stated that your foot was caught in a switch, didn't you? A. I did, and I thought that.

"And when you were asked if that was so, when you were asked if the plank, the boards, or the planking between the rails had anything to do whatever with your foot being caught, you were very sure it did not? A. I don't think it did.

"As a matter of fact, you now think that your foot was caught between the planking and the rail, do you not? A. It must be because there is no switch there, what you call it, I don't know the names.

"A switch? A. It must have been something of that kind."

The witness was then shown a mark "like a sort of a double cross in pencil on the planking" in the photograph, which it was claimed by counsel was made by the plaintiff at the first trial as indicating where he thought the accident occurred, and was asked if that did not "indicate about the place where you were when your foot was caught," and his answer was:

"Oh, well, that might be a little this way or that way; but that is as near as I can—I couldn't say it was there in a certain place, you know; but that is as near as I can tell it."

The defendant requested the presiding judge to instruct the jury, first:

"There is no evidence to warrant a finding that the plaintiff was caught by anything except between the east rail and the planking."

Second:

"There is no evidence to warrant a finding that the accident happened at any point except opposite some portion of the railing extending north from the corner of the boiler house and at a point north of the boiler house."

The failure of the court to give these instructions is assigned as error. The court correctly instructed the jury that the principal question was whether the plaintiff was caught at all, either between the planking and the rail or between the guard rail and the rail; that the negligence alleged was not in the construction of the roadbed in any particular place, but the failure of those in charge of the train to see the situation of the plaintiff and stop the train before it reached him.

Whether the plaintiff was caught at all, and where he was caught, were questions of fact for the jury under all the evidence in the case, and the instructions requested, if given, would have taken their determination from the jury. We think there was no error in refusing to give them. Whether the plaintiff was caught and held so he could not extricate himself, or received his accident as claimed by the defendant, was a pure question of fact whose determination was peculiarly within the province of a jury. Neither the plaintiff nor any of the witnesses could locate the exact spot where the accident occurred, which is not strange in view of the excited condition in which they must have been.

After the jury had had the case under consideration from 3:30 p. m. on the day when it was committed to them, until 10 o'clock the next day, they were called in by the presiding judge and given further instructions, and to these instructions the defendant seasonably excepted, and assigns them as error. The court called the attention of the jury to the case of Commonwealth v. Tuey, 8 Cush. (Mass.) 1, which he told them had been adopted by the Supreme Court of New Hampshire in the case of Ahearn v. Mann, 60 N. H. 472; and also that in the Massachusetts case and in the New Hampshire case it was held:

"That those in the minority should not unreasonably stand upon their own opinions, but should be admonished by the fact that the majority of their associates were assembled with them for the same purpose, and with the same responsibility."

He also made it plain that a juror was not to yield his honest opinion, for he said:

"The logic of that does not mean that a juror should lightly surrender an opinion which he conscientiously finds himself holding, but it does admonish the juror or jurors in minority to stop and consider whether it is probable that he who is here under oath to help decide this case, and finds himself confronted by men of equal intelligence and responsibility in the majority against him, is more likely to be surely right than they upon this highly disputed question about which no man can be absolutely certain anyway. Is it probable I am right or that the majority are right?"

The instructions given were quite lengthy, and were in substance that, in a large proportion of cases, absolute certainty could not be expected, and while the duty of a minority to listen to the arguments of a majority was impressed upon the jury, the jury were told:

"The logic of that does not mean that a juror should lightly surrender an opinion which he conscientiously finds himself holding."

Part of the charge in the New Hampshire case which the judge quoted to the jury made it evident that no juror was to yield his honest and well-settled convictions for the sake of reaching a verdict, and was as follows:

"Absolute certainty cannot be attained, and is hardly to be expected in the majority of civil causes; and while no juror is required to yield his honest and well-settled convictions to the judgment of others for the sake of reaching a verdict, it is the duty of a juror, when he finds himself differing with the majority of his fellows, equally honest and capable as himself of judging of the weight of evidence, to examine thoroughly and carefully the ground of his own opinion."

These instructions were very similar to those sustained in Allen v. United States, 164 U. S. 492, 17 Sup. Ct. 154, 41 L. Ed. 528, which were in substance:

"That in a large proportion of cases absolute certainty could not be expected; that although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, * * * if much the larger number were for conviction, a dissenting juror should consider whether his doubt was a reasonable one which made no impression upon the minds of so many men, equally honest, equally intelligent with himself. If, upon the other hand, the majority were for acquittal, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which was not concurred in by the majority."

And the court said:

"While, undoubtedly, the verdict of the jury should represent the opinion of each individual juror, it by no means follows that opinions may not be changed by conference in the jury room. The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror should go to the jury room with a blind determination that the verdict shall represent his opinion of the case at that moment; or, that he should close his ears to the arguments of men who are equally honest and intelligent as himself."

We think there was no error in the instructions given, qualified as they were by the statement that each juror should not lightly surrender an opinion which he conscientiously found himself holding, and also by the language in the New Hampshire case from which the presiding judge quoted and adopted in which the jury was told that the juror who was in the minority was not required to yield his honest and well-settled convictions to the judgments of others for the sake of reaching a verdict.

The judgment of the District Court is affirmed; the defendant in error to recover his costs of appeal in this court.