Hillsborough, }
Jan. 1, 1935. }

ROBERT HOWSON & a. v. FOSTER BEEF COMPANY.

JOHN C. AHERN v. SAME.

WINTHROP WADLEIGH, *Adm'r v.* SAME.

*Doyle & Doyle*, for Robert and Alice Howson.

*Wyman, Starr, Booth & Wadleigh* (*Mr. Booth* orally), for John C. Ahern and Winthrop Wadleigh, administrator.

*Samuel A. Margolis* (by brief and orally), for the defendant.

MARBLE, J.   On September 30, 1931, Mathilda Ahern, the wife of the plaintiff John C. Ahern, purchased at the bakery and food shop of Robert and Alice Howson in Manchester six small pork pies. The Howsons had bought the pork contained in these pies from the defendant company.   It was in the form of three pork butts, so called, weighing 21½ pounds, and came from a carload of meat received by the defendant from the Dold Packing Company on September 23 and waybilled from the Union stockyards on September 18.   When Robert Howson ordered the pork he told the defendant that he "wanted to make some pork pies."

The members of the Ahern family who ate the pies became sick, and Raymond Ahern, a boy twelve years old, after eating two of the pies, died.   The cause of his death and the sickness of the others was poison from certain bacteria with which the pies were infected. Tests made at the state laboratory of hygiene proved these bacteria to be colon bacilli.

There was evidence that the colon bacillus is common to the intestinal tracts of men and beasts and that it may under certain circumstances be present in the tissues of an animal at the time of slaughter.   The principal controversy at the trial related to the source of the infection, the Howsons claiming that the pork was already infected when sold to them by the defendant company, the defendant claiming that the infection was caused by the unsanitary condition of the Howsons' bakery.

At the time the pies were made, several members of the Howson family including a three-year-old son were afflicted with diarrhoea, and Mrs. Howson while at work on the pies was obliged to stop frequently to take the boy to the bathroom, which adjoined the kitchen. The making of the pies with soiled hands and the carrying of germs by flies were suggested as possible means of contamination.

The defendant's evidence tended to prove that even if colon bacilli had been present in the pork when the pies were made, the process of baking would have rendered them innocuous.   The plaintiffs introduced evidence to the contrary.   Dr. Stewart, the physician who attended Raymond Ahern, testified that he had supplemented his "general medical knowledge with readings about food poisons." The only objection to his testimony related to an interrupted inquiry as to symptoms he had observed "such as very commonly are found in meat conditions."   After the court had ruled that "That comes

within a doctor's general knowledge," the inquiry was withdrawn, and the witness was then asked whether diseased meat would produce the symptoms observed in Raymond Ahern. On the evidence Dr. Stewart's qualifications were clearly sufficient to justify the trial court in allowing him to answer that question. *Eames* v. *Corporation*, 85 N. H. 379, 385. Dr. Stewart further testified (and without exception) that colon bacilli were so resistant to heat that if present in the pork when purchased from the defendant, the baking of the pies would not have destroyed their poisonous effects, but that, on the other hand, "an infection from diarrhoea" would probably "be rendered sterile" by the baking. In his opinion the colon bacilli were in the pork when the Howsons bought it.

Mrs. Howson testified that after taking the boy to the toilet she always washed her hands and scrubbed her nails. An inspector employed by the Manchester board of health, who inspected the bakery shortly after the pies were sold, stated that there were no signs of flies about the premises. Various persons beside the Aherns were sick after eating some of the pork pies, but there were no complaints from purchasers of chicken pies or meat pies made by the Howsons during the same period that the pork pies were made.

On this evidence it could fairly be found that the pork was contaminated when it left the defendant's hands and that it was not "afterwards purified by boiling and baking." This finding would not be a "conjecture between equal possibilities, but the ordinary determination of a conclusion from inferences supported by a balance of probabilities." *Saad* v. *Papageorge*, 82 N. H. 294, 296.

The plaintiffs contend (1) that the provisions of the uniform sales act (P. L., c. 166, s. 15, *paragraphs* I, II) imposed upon the defendant company the liability of a warrantor, and (2) that since the selling of contaminated meat constitutes a violation of the pure food law (P. L., c. 139, ss. 1, 3; Laws 1929, c. 45, s. 5), the defendant, in view of the third finding of the jury, was guilty of negligence as a matter of law.

It is true that since the passage of the sales act "Dealer as well as manufacturer or grower affirms as to anything he sells, if purchased by description, that it is of merchantable quality." *Ryan* v. *Progressive Grocery Stores*, 255 N. Y. 388, 392. See also *Burkhardt* v. *Company*, 115 Conn. 249; *Ward* v. *Company*, 231 Mass. 90; *Griffin* v. *Company*, 108 N. J. Law 92. But this is far from saying that the statute has abolished the rule of privity and that the imposed warranty runs with the goods in the sense that it is available to the sub-

vendee. In the *Ryan* case the court (*Cardozo*, C. J.) is careful to state that the plaintiff through his wife, who acted as his agent, bought the warranted article (a loaf of Ward's bread) directly from the defendant.

In connection with the sales of personal property, it is the general rule "that warranties do not run in favor of any but an immediate purchaser." 1 Williston, Sales, (2d *ed.*), *s.* 244, *p.* 489. An apparent exception to this rule is found in those cases which permit the sub-purchaser to recover against the manufacturer. The suggestion that these cases are defensible on the theory that the representations of the manufacturer (usually by means of trade-marks, labels or advertisements) "are in substance made directly to the sub-purchaser" (45 Harv. Law Rev. 1418; see also 1 Williston, Sales, *s.* 244a) does not require discussion, however, since the packing company is not a party to these proceedings.

It is our conclusion, therefore, that no liability as warrantor was imposed on the defendant company in favor of the plaintiff John C. Ahern or the decedent Raymond G. Ahern, neither of whom dealt directly with the defendant. *Chysky* v. *Company*, 235 N. Y. 468; *Carlson* v. *Turner Centre System*, 263 Mass. 339; *Conn. Pie Co.* v. *Lynch*, 57 Fed. Rep. (2d) 447. The case of *Challis* v. *Hartloff*, 136 Kan. 823, holding that a wholesale merchant is liable under his implied warranty not only to his immediate vendee but to his vendee's customer is not compatible with the trend of our decisions. *Kenney* v. *Len*, 81 N. H. 427, 435-440.

Nor are the actions maintainable on the theory that violation of the pure food law is negligence *per se*.

"The doctrine of negligence *per se* purports to dictate an inflexible application of the legislature's criminal standard of conduct to a civil case when the legislature has not attempted any legislation to govern tort trials." Morris, Criminal Statutes and Tort Liability, 46 Harv. Law Rev. 453, 473.

This doctrine does not prevail in New Hampshire. It is the rule here that the violation of a penal statute is an actionable wrong only when the legislature expressly so provides (see P. L., *c.* 162, *ss.* 25, 26, relating to the sale of petroleum, naptha, and illuminating gas), or when the purpose and language of the statute compel such inference (*Johnson* v. *Railroad*, 83 N. H. 350; *Clark* v. *Hampton*, 83 N. H. 524, 529; *L'Esperance* v. *Sherburne*, 85 N. H. 103, 107; *Vidal* v. *Errol*, 86 N. H. 1, 3-6; *Prescott* v. *Yurchus*, 86 N. H. 108). Says Professor Charles L. B. Lowndes: "When a statute explicitly creates a criminal

liability, the court which reads a civil obligation into the enactment is embarking upon a perilous speculation. This does not exceed its power, but it does overstep the decent amenities of judicial conduct." 16 Minn. Law Rev. 361, 363.

There is here no evidence that the defendant knew or had the slightest reason to suspect that the pork which it sold was contaminated. The presiding justice correctly ruled that there was no evidence which would warrant a finding of liability against the defendant company based on negligence in fact. Section 13 of the pure food law provides that where the violation of the act is not wilful the institution of a prosecution shall be at the discretion of the state board of health. No prosecution appears to have been instituted in the present case. Under such circumstances there is some question as to whether the defendant company is guilty of any offense at all. *Coutremarsh* v. *Metcalf, ante*, 127. Certainly no legislative intent to make a person in the defendant's position liable in a civil action for damages can fairly be inferred from the provisions of the act.

It is of no consequence that the presiding justice instructed the jury in accordance with the theory of the law advanced by counsel for Ahern and the administrator. The special findings of fact relating to the alleged contamination of the pork were in no way dependent on rules governing warranty and negligence *per se*. Furthermore the defendant protected its rights by moving for nonsuits and directed verdicts. Since the motions should have been granted in the *Ahern* and *Wadleigh* cases, the defendant waived nothing so far as those cases were concerned by failing to object to the charge. In *Coté* v. *Company*, 86 N. H. 238, on which reliance is placed, the motion for a directed verdict was properly denied. Consequently, errors in the charge were waived unless excepted to. The alleged error in the *Coté* case was the court's instruction that the jury might consider certain evidence in determining whether or not a revolver had been fired within the compact part of a city. This fact was material on the issue of contributory illegality, and the evidence was relevant if the court's definition of "compact part" was correct. Since no exception was taken to the definition, "it became the unquestioned law of the trial." The defendant did not profess to be entitled to a directed verdict on the issue in question. 432 Briefs & Cases, 495-497.

The *Wadleigh* case invites special consideration. Without evidence of fraud or negligence on the defendant's part, there could be

no recovery for the death of Raymond G. Ahern, even if the rule of privity did not prevail.

"At common law no civil action could be maintained for the killing of a human being. *Wyatt* v. *Williams*, 43 N. H. 102, and authorities cited." *Cogswell* v. *Railroad*, 68 N. H. 192, 194. The right to maintain such an action was first granted by chapter 35 of the Laws of 1879, which provided that an executor or administrator might recover damages for a decedent's death when that death had been caused "by a wrongful act or neglect of another." This statute was succeeded by Laws 1887, *c.* 71, and that act, as well as chapter 11 of the Laws of 1885 relating to the survival of actions and causes of actions, was in turn supplanted by P. S., *c.* 191, *ss.* 8-13, which, re-enacted as P. L., *c.* 302, *ss.* 9-14, is the statute now in force. The "new action" authorized by section 11 of the present act permits the bringing of suits for death only in cases "of tort for physical injuries to the person" (P. L., *c.* 302, *s.* 9).

The meaning of the word "tort" as used in section 9 and incorporated in section 11 by reference has been judicially defined as "a wrong apart from contract." *Cochran* v. *Laton*, 78 N. H. 562, 563. "The statute applies to torts as violations of legal rights which are not contractual in nature, and a liability not resulting from a tort and being only a liability to pay money is in no way a liability for tort." *Holland* v. *Company*, 83 N. H. 482, 484.

The plaintiff Wadleigh concedes all this to be true, but calls attention to the fact that the original remedy for false warranty was an action on the case sounding in tort, and quotes Professor Williston to the effect that it was "not until 1778 that the first reported decision occurs of an action on a warranty brought in *assumpsit*." 1 Williston, Sales (2d *ed.*), *s.* 195, *p.* 369.

The initial conception of the action as one of tort is not significant, for "Originally every action of assumpsit treated a breach of promise as a tort." *Shaw*, C. J., in *Dickinson* v. *Winchester*, 4 Cush. 114, 120. Ames in his "Lectures on Legal History," *p.* 144 (2 Harv. Law Rev. 1, 15), states: "Both in equity and at law, . . . a remediable breach of a parol promise was originally conceived of as a deceit; that is, a tort. Assumpsit was in several instances distinguished from contract. By a natural transition, however, actions upon parol promises came to be regarded as actions *ex contractu*."

In actions for breach of warranty (at first regarded as pure actions on the case for deceit with all the technical requisites of pleading and proof peculiar thereto), the early elimination of the requirement that

*scienter* be proved indicated a recognition of the fact that the gist of the action was not in reality a deceit practiced upon the plaintiff but rather a breach by the defendant of an obligation undertaken by him. The "notion of undertaking" was "well conveyed" by the words *"warrantizando vendidit,"* which appeared in the conventional form of declaration long before the action of special assumpsit was known. Ames, "Lectures on Legal History," 136 (2 Harv. Law Rev. 1, 8). Under these circumstances, the development of the modern conception of this action as one sounding in contract was inevitable.

Since the statute authorizing suits for death is "a comparatively modern innovation" (*Piper* v. *Railroad,* 75 N. H. 435, 444; *West* v. *Railroad,* 81 N. H. 522, 530), it is highly improbable that the meaning of the word "tort" could have been intended to depend on the ancient classification of actions. In this jurisdiction a warranty has long been regarded as a "contract," "an engagement, a promise to make good." *Bedell* v. *Stevens,* 28 N. H. 118, 123, 126. And as early as 1853, when *Bedell* v. *Stevens* was decided, it was "the practice of the profession . . . to declare in assumpsit upon such contracts." *Ib.,* 126. "There is no doubt that to-day the obligation of a warrantor is generally conceived of as contractual." 1 Williston, Sales (2d *ed.*), *s.* 197, *p.* 373. See also *McQuaid* v. *Michou,* 85 N. H. 299, 300, 301.

A warranty is none the less a contract because it contains a fraudulent or negligent misrepresentation (*Mahurin* v. *Harding,* 28 N. H. 128, 130), but in such case if the plaintiff seeks to recover because of the fraud or negligence involved, his cause of action is not upon the contract (though it may be "alleged by way of inducement"— *George* v. *Skivington,* L. R. 5 Ex. 1, 3) but for an injury caused by such special wrong. (*Mahurin* v. *Harding,* 28 N. H. 128, 130-132; *Spead* v. *Tomlinson,* 73 N. H. 46, 60; *Cunningham* v. *Company,* 74 N. H. 435; *Maxwell Ice Co.* v. *Company,* 80 N. H. 236, 239).

The only warranty in the present case is that imposed by statute. The violation of a duty so imposed is not necessarily a tort. *Holland* v. *Company,* 83 N. H. 482. The sales act does not so designate a violation of any of the provisions of section 15, and there is nothing to indicate that the legislature intended to subject a seller whose only fault is an innocent breach of one of these imposed warranties to arrest on civil process, as would be the case if such breach were tortious. *Eames* v. *Stevens,* 26 N. H. 117; *Mahurin* v. *Harding,* 28 N. H. 128, 130, 134. See P. L., *c.* 333, *s.* 7, exempting defendants from arrest "on a writ in an action founded on a contract."

The statute discloses no legislative purpose to treat the character of an implied warranty as different from that of an express one. "The clauses of the sales act styled as warranties are only refutable presumptions, requiring negation of what previously required proof." *Kenney* v. *Len*, 81 N. H. 427, 439. Obviously the fact here presumed is a promise on the defendant's part to be answerable for the quality of the meat sold. The breach of this implied promise is no more tortious than the violation of any other promise implied by law. /

Certain exceptions in connection with the *Howson* case remain to be considered. Since there was privity between the Howsons and the defendant, the motion for a directed verdict in this case was properly denied.

No error is apparent in the exclusion of the defendant's offer to show what customers purchased the pork butts contained in the carload of September 23. The plaintiffs claimed that the pies were infected by the meat of a hog suffering from septicemia when slaughtered. The car contained 21,660 pounds of fresh meat and 785 pounds of pork butts put up in 35- or 50-pound boxes or crates. It is difficult to see how the fact that no complaints had been received from those who purchased the rest of the carload had any appreciable tendency to prove that the particular butts sold the Howsons were free from colon bacilli. At best, the question was one of remoteness for the presiding judge. Hening's Digest, *p.* 585.

The findings must, however, be set aside.

The meat-inspection act provides that the secretary of agriculture shall cause to be made by inspectors appointed for that purpose "a post mortem examination and inspection of the carcasses and parts thereof of all cattle, sheep, swine, and goats to be prepared for human consumption at any slaughtering, meat-canning, salting, packing, rendering, or similar establishment in any State, Territory, or the District of Columbia for transportation or sale as articles of interstate or foreign commerce; and the carcasses and parts thereof of all such animals found to be sound, healthful, wholesome, and fit for human food shall be marked, stamped, tagged, or labeled as 'Inspected and passed'." 34 U. S. Stat. 1260, 1261; 21 U. S. C. A., *s.* 72. The counterfeiting or unauthorized use of any mark, stamp, tag, or label is made an offense punishable by fine and imprisonment (21 U. S. C. A., *ss.* 79, 88), and carriers are forbidden to transport in interstate commerce any meat which has not been inspected and marked as inspected and passed (*Ib., s.* 78).

The defendant offered to prove "that all the boxes containing the

pork butts in question, were stamped by Government inspection stamps, on leaving the packing plant in Omaha, Nebraska, and were on the box on receipt in Manchester."

While the fact that the pork was inspected and passed by government officials was not a complete defence to the action against the beef company (*Catani* v. *Company*, 251 Pa. St. 52, 61; *Rinaldi* v. *Company*, 157 N. Y. Supp. 561), it tended to prove that the meat was fit for human consumption when it was consigned to the beef company, and, since there was no evidence of negligence on the company's part, that it was therefore uncontaminated when sold to the Howsons. The proffered evidence was excluded apparently on the ground that there was no proof "of what the Federal inspection does amount to" and because the evidence was "offered through Jacob Foster," president and general manager of the defendant company.

These grounds of exclusion are untenable. In the absence of evidence to the contrary it will be presumed that an examination made imperative by act of congress and conducted by government inspectors will be adequate to accomplish the purpose of the act, which is declared to be the prevention of "the use in interstate or foreign commerce of meat and meat food products which are unsound, unhealthful, unwholesome, or otherwise unfit for human food" (21 U. S. C. A., s. 71).

By the terms of the act the secretary of agriculture is authorized to make rules and regulations regarding meat inspection (21 U. S. C. A., s. 89), and these rules and regulations have the force of law. *State* v. *Peet*, 80 Vt. 449, 455. See also *United States* v. *Company*, 243 Fed. Rep. 441. The principal regulations operative in 1931 are contained in a publication issued by the department of agriculture December 2, 1922, and entitled "B. A. I. [Bureau of Animal Industry] Order 211—Revised." The inspection requirements there prescribed are too minutely detailed to permit enumeration here, but a few general regulations pertinent to the present controversy are noted.

By regulation 9 an ante-mortem examination of all swine about to be slaughtered in any slaughtering or packing establishment must be made before slaughtering is allowed. This examination includes the taking of temperatures and other tests to detect hog cholera, swine plague, and septicemia. Regulation 11 provides that carcasses of animals showing, on post-mortem examination, lesions or other signs of any of eight specified diseases including septicemia and hemorrhagic septicemia must be condemned. All meat inspectors are appointed upon certification of the United States civil service

commission that they have passed the examination prescribed by that commission, and all final post-mortem examinations must be performed by veterinary inspectors, who must be graduates of veterinary colleges accredited by the commission.

Clearly the requirements of the government inspection were adequate, if followed, to have detected the contamination claimed.

The other ground of exclusion relates to the formal offer of proof. Certainly the witness was entitled to show the quality of the meat purchased, and, to that end, to state that it was government-inspected pork. For the purposes of discussion, however, it may be conceded that the evidence had reference to the "contents" of a written official statement. Such statements "are generally admissible in evidence, notwithstanding their authenticity is not confirmed by those usual and ordinary tests of truth—the obligation of an oath and the power of cross examining the persons on whose authority their truth and authenticity may depend." *Ferguson* v. *Clifford*, 37 N. H. 86, 95. See also 3 Wig. Ev. (2d *ed.*), *ss*. 1631, 1632.

In an action on a war risk insurance policy, a tag, field medical card, identified by the plaintiff as having been attached to his clothing in a field hospital in France, was held admissible, *Parker*, Circuit Judge, declaring: "The evidence offered falls clearly within the principles under which exceptions to the hearsay rule are admitted, *i.e.*, necessity and circumstantial guaranty of trustworthiness. . . . Tested by the first principle, the persons making the entries are not as a practical matter available as witnesses, and evidence of importance to the parties would be lost if entries made by them were not received. Tested by the second, the entries were made by highly intelligent officials of the government in the discharge of their official duties, with no motive to state anything but the truth and subject to reprimand and humiliation in the eyes of their professional associates if they were inaccurate. It is hard to imagine a situation where entries would come with a stronger guaranty of their trustworthiness." *United States* v. *Wescoat*, 49 Fed. Rep. (2d) 193, 195.

Since the inspection stamps themselves would have been admissible, if offered, on satisfactory evidence that they had been destroyed (and there is evidence from which this fact could be inferred), oral testimony as to their existence and to the words printed or inscribed thereon was admissible. *State* v. *Wren*, 77 N. H. 361, 362, and cases cited.

In view of the conclusion reached, it is unnecessary to discuss the other rulings to which exceptions were taken. No error in connec-

tion therewith is apparent. Since the only questions here presented relate to the exceptions of the Foster Beef Company, questions which might have been raised in the actions against the Howsons have not been considered.

*New trial in the Howson case.*

*Judgments for the defendant in the other cases.*

All concurred.