**ORTHOPEDIC EQUIPMENT CO., Incorporated, Appellant,**

v.

**Dennis EUTSLER, Appellee.**

**No. 8002.**

United States Court of Appeals
Fourth Circuit.

Argued Jan. 14, 1960.

Decided March 14, 1960.

James H. Simmonds, Arlington, Va. (Howard M. Murphy, Arlington, Va., on brief), for appellant.

David G. Bress, Washington, D. C., and Hardy C. Dillard, Charlottesville, Va. (John T. Camblos, Charlottesville, Va., Leonard Braman, Newmyer & Bress, Washington, D. C. and Michie, Taylor, Camblos & Deets, Charlottesville, Va., on brief), for appellee.

Before SOBELOFF, Chief Judge, and SOPER and BOREMAN, Circuit Judges.

SOBELOFF, Chief Judge.

A manufacturer of surgical instruments and equipment, an Indiana corporation known as Orthopedic Equipment Company, Inc., is accused in this diversity action of misbranding a surgical nail which became stuck in the plaintiff's leg in the course of an operation. From a judgment for $75,000 in favor of Dennis Eutsler, the plaintiff, a resident of Virginia, the defendant appeals.

The circumstances out of which the action arises are as follows. On March 30, 1956, the twenty-one year old plaintiff was helping his father take down a tree on a farm near Orange, Virginia. He was injured by the tree falling upon him. At the University of Virginia Hospital, it was found that he had sustained a fracture of the leg and other injuries. In the judgment of the surgeons, the treatment indicated for the fracture was an operation known as intramedullary nailing by use of a Kuntscher Cloverleaf Intramedullary Nail.[1] This involves the insertion of a long metal rod or nail into the medullary canal (containing the marrow) of the femur (or thigh bone), in order to stabilize the broken fragments. The advantage sought by this method is an early union and weight-bearing without the necessity of a plaster cast.

A team of orthopedists, experienced in this technique, operated on April 3, 1956. Having prepared the canal by use of a 9mm.[2] medullary reamer or drill,

[1.] The nail is named for Dr. Kuntscher, a German who originally devised the nailing operation during World War II. The nail is tubular but the hollow is not circular; it has indentations running the length of the nail, which give it the appearance, viewed from either end, of a cloverleaf; hence its name.

[2.] Although the operative note of the hospital record stated that a 10mm. reamer was used, the reliability of this note was challenged by plaintiff, who pointed out

the surgeons began to insert into the medullary canal a Kuntscher Cloverleaf intramedullary nail manufactured by the defendant. These Kuntscher nails usually have imprinted upon them two figures signifying their dimensions, e. g., 9 x 40, 10 x 42, but the imprint or label does not explain the meaning of these figures. It is agreed by the parties that the larger figure is understood to represent the length of the nail in centimeters. According to the plaintiff's expert witnesses, the interpretation placed upon the smaller figure by orthopedists is that the nail will fit into a hole having a width or diameter corresponding in millimeters to the figure on the nail. This follows from the necessity that the nail shall fit tightly into the canal previously prepared by a reamer of corresponding diameter. These witnesses also testified that after the canal is reamed, the nail is selected on the basis of the measurement on its "label," or imprint, conforming to the measurement of the reamer used. Furthermore, plaintiff's experts testified, orthopedic surgeons invariably rely upon the figures imprinted on the nail, when there are figures imprinted, without making independent measurements. Thus, according to the surgeons, they relied in this instance too on the accuracy of the marking, "OEC 9 x 40," in selecting the nail.

As the nail was driven down the canal of the upper fragment of the thigh bone, the surgeons at first met normal resistance. When it penetrated further, however, greater resistance was encountered. Nevertheless, the doctors did not regard this as unusual, since they knew that they had used a 9mm. reamer and the nail was marked to indicate 9mm.; they concluded that it must merely have met some slight obstruction which, as in past operations, would be passed or overcome without difficulty. Accordingly, as was customary in such cases, two

several errors in it. Furthermore, there was persuasive testimony by the chief surgeon that a 9mm. reamer was used, and the jury presumably found this to be the fact.

or three slightly heavier blows were then struck.

Because the nail would progress no further even after these heavier blows, the surgeons decided to remove it. However, when persistent efforts to dislodge the nail proved unavailing, the portion of the nail protruding below the canal of the upper fragment was cut off, the wound closed, and a plaster cast applied in the hope that in a few weeks the bone would atrophy sufficiently to loosen the nail and permit its withdrawal.

About a month later, on May 4, the surgeons again tried to extract the nail, but were unsuccessful. Thereupon, one of the doctors designed a new instrument, and by its use removal of the nail was finally accomplished in a third operation on June 5. Measurements of cross-sections of the nail, as testified to by a machinist, varied from a minimum of 9.27mm. to a maximum of 10.12mm.

Due to the nail's impaction, incurable osteomyelitis or bone infection resulted. The plaintiff has permanently lost the use of his leg, and its ultimate amputation is expected.

This action was brought against defendant for alleged "negligent manufacture, labelling and launching on the market of said nail * * *," plaintiff presumably at first intending to charge ordinary common law negligence only. Later, however, it was stipulated by counsel that, without formal amendment, the complaint should also be regarded as alleging a violation of the Federal Food, Drug, and Cosmetic Act. In this appeal, the defendant assigns five grounds of error, which we shall now discuss.

### The Federal Food, Drug, and Cosmetic Act

Defendant contends, for two reasons, that the District Judge erred in basing his charge to the jury on the Federal Food, Drug, and Cosmetic Act, 21 U.S. C.A. §§ 301–392.[3] It asserts first, that

3. The relevant provisions of the Act follow:
　　Section 321(h). "The term 'device' * * * means instruments, apparatus, and contrivances, including their compo-

the evidence of misbranding is insufficient, and second, that in any event, the Act does not apply to surgical instruments.

It will be seen that "misbranding" is defined in section 352 of the Act as labeling that is false or misleading in any particular. Defendant argues that the evidence was insufficient to raise a jury question of a "misbranding" violation under the Act since its labeling was neither false nor misleading. The doctors who performed the operation testified that in accordance with the prevailing interpretation of the profession they understood that the cross-sectional dimension, imprinted on the nail, meant that it could be inserted into a hole made with a reamer bearing a diameter measurement corresponding to the number appearing on the nail. Defendant's brief insists, however, that this "understanding" does not relate to the measurement or dimension of the nail at all, but to the reamer. Such a reference, the argument goes, leads to numerous uncertainties: reamers are not always used in these nailing operations; the reamer used may be made by a company other than the manufacturer of the nail, as was the case here; the reamer itself may be measured inexactly.[4] Thus, defendant asserts, the doctors' understanding was incorrect and unsupportable.

■ We think that the evidence was sufficient to raise a jury question of misbranding. Notwithstanding the defendant's expert testimony to the contrary, the testimony of plaintiff's experts as to the understanding of the medical profession of the number 9 on the nail certainly presented an issue for the jury as to the "true" meaning of the number.

Furthermore, the defendant points out that its catalogue was available in the hospital, but the surgeons performing the operation admittedly had not read it. However, what the defendant claims the catalogue would show, namely that the figure on the nail refers to its "width," does not seem to aid the defendant's argument. Even if, as defendant argues, the number did refer to the "width" of the nail, and assuming for the sake of the argument that "width" is different from diameter, it is undisputed that the nail was actually more than 9mm. wide. Properly, it was left to the jury to judge the weight of the testimony offered by the plaintiff and the answering explanations advanced by the defendant, and the jury was clearly warranted in concluding that the labeling was false or misleading.

■ Defendant insists that, in any event, the Federal Food, Drug, and Cosmetic Act does not apply to surgical nails marketed for use only by skilled surgeons. With this we are compelled to disagree. The definition of "devices" embraced by the Act [5] is clearly of sufficient breadth and scope to include a surgical nail, which frequently remains in the patient for many months and is designed to and does affect both the "structure and function of the body".[6]

---

nents, parts, and accessories, intended (1) for use in diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; or (2) to affect the structure of any function of the body of man or other animals. * * *"

Section 331. "The following acts and the causing thereof are hereby prohibited:

"(a) The introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded * * *"

Section 352. "A drug or device shall be deemed to be misbranded—(a) If its labeling is false or misleading in any particular * * *."

4. In the instant case, the reamer which the jury presumably found was used had a diameter of 9.22mm. This does not help defendant, however, since the hole drilled would give extra space for a 9mm. nail.

5. See § 321(h), quoted in Note 3, supra.

6. Arguably, the intramedullary nail is embraced in clause (1) as well, since a broken bone might reasonably be considered a diseased condition of the body, and the nail is used to assist in the cure, mitigation, and treatment of the diseased condition.

It is urged by defendant that the regulations issued pursuant to section 352(f) of the Act nevertheless exempt manufacturers from the obligation to give directions for the use of surgical instruments since such devices are designed for use by a skilled profession.[7] This specific exemption of surgical instruments from section 352(f), however, does not relieve the defendant from compliance with other provisions of the Act, including the remainder of section 352, and seems to us rather to indicate a contrary intention. In short, while the Act imposed no obligation upon defendant to label its nail, once it undertook to do so the Act required it to avoid misbranding.[8]

The dicta quoted in defendant's brief to the effect that the Act was designed primarily to protect the public, especially consumers,[9] do not support the inference that defendant seeks to draw, namely that surgical instruments are not meant to be covered by the Act since they are not ordinarily sold to members of the public. On the contrary, these expressions are more consistent with the inclusion of such instruments within the scope of the Act, for the patient as a member of the public is the ultimate consumer. As the District Judge said, in overruling defendant's motion for summary judgment,

> " * * * I think it is immaterial that the nail was not sold to, or purchased by the plaintiff, and I think it is incorrect to say that the nail was not manufactured for sale to, or use by, the general public. Actually it was, although it was to reach the general public through expert hands."

Having determined that the Federal Food, Drug, and Cosmetic Act applies in the instant case, and that there was sufficient evidence of misbranding, we turn now to the effect of a violation of the Act. The Federal Food, Drug, and Cosmetic Act does not expressly provide a civil remedy for injured consumers. However, the statute imposes an absolute duty on manufacturers not to misbrand their products, and the breach of this duty may give rise to civil liability.[10]

---

7. 21 C.F.R. § 1.106.

8. An often cited letter containing the Food and Drug Administration's views on this question merits consideration. Trade Correspondence dated March 14, 1940, contains the following:

> "Visitor at interview submitted a list of questions, the answers to which were furnished in a letter.
> "Are the usual surgical instruments used by surgeons, such as knives, scissors, forceps, saws, mallets, chisels, needles, drills, *nails*, and screwdrivers, embraced *within the definition of 'device'* contained in Section 201(h) of the Federal Food, Drug, and Cosmetic Act? *Yes*." Quoted in Kleinfeld and Dunn, Federal Food, Drug, and Cosmetic Act 1938–1949, 631 (1949). (Emphasis supplied.)

Although the date of this Trade Correspondence is March 14, 1940, several years before intramedullary nails were first used by Dr. Kuntscher, the ruling would seem logically to cover them within its ambit.

The substance of this ruling was contained in a statement outlining this entire subject in the American Surgical Trade Association Journal, July, 1941.

See Toulmin, The Law of Foods, Drugs and Cosmetics, § 435 (1942).

9. See e. g., United States v. Sullivan, 1948, 332 U.S. 689, 696, 68 S.Ct. 331, 335, 92 L.Ed. 297:

> "For the Act as a whole was designed primarily to protect the consumers from dangerous products. This Court so recognized in United States v. Dotterweich, 320 U.S. 277, 282 [64 S.Ct. 134, 88 L.Ed. 48], after reviewing the House and Senate Committee Reports on the bill that became law. * * *"

62 Cases, etc., of Jam v. United States, 1951, 340 U.S. 593, 596, 71 S.Ct. 515, 518, 95 L.Ed. 566:

> "By the Act of 1906, 34 Stat. 768, as successively strengthened, Congress exerted its power to keep impure and adulterated foods and drugs out of the channels of commerce. The purposes of this legislation, we have said, 'touch phases of the lives and health of people which, in the circumstances of modern industrialism, are largely beyond self-protection * * *.'"

10. 2 Harper and James, The Law of Torts, § 28.26 (1956); Note, 26 Va.L.Rev. 100 (1939).

The basic question is whether a violation of the strict duty created by the Act shall be deemed negligence per se under Virginia law, assuming as we must from the submission made to the jury and from its verdict, that the violation was the proximate cause of the plaintiff's injury. The majority of American courts which have passed on this question, in cases arising under state laws resembling the Federal Act, have held violations to be negligence per se.[11] Apparently the Supreme Court of Appeals of Virginia has not had occasion to decide whether a violation of the Virginia Food Act,[12] or the state statutory provisions dealing with misbranding and adulteration of drugs and cosmetics,[13] constitutes negligence per se. The Virginia Court, however, has stated, in a case involving a motor vehicle statute, that:

> "The violation of a statute, although negligence per se, will not support a recovery for damages unless such violation proximately causes or contributes to the injury complained of." Reid v. Boward, 1943, 181 Va. 718, 723, 26 S.E.2d 27, 29.[14]

█ Since Virginia law seems to regard violation of motor vehicle statutes as negligence per se, again assuming from the jury's verdict here that the violation was found to be a proximate cause of the injury, and in light of the decisions in other states passing on this question, we think that a violation of the Federal Food, Drug, and Cosmetic Act is negligence per se in Virginia, and that the District Judge correctly based his charge on that premise.

*The Court's Rulings on Negligence*

█ Defendant also contends that the District Court erred in refusing to explain the elements of due care and foreseeability in its charge to the jury and in refusing to admit evidence offered by the defendant on the issue of foreseeability. It is true that the District Judge excluded certain testimony proffered to show that the defendant could not have foreseen injury from its nail since no complaints of mislabeling had ever been made to it. While, in his instructions, the District Judge did couple every reference to mislabeling with the qualifying phrase "likely to do harm," and this phrase might be considered as presenting, in substance, the element of foreseeability, the defendant would be justified in complaining if its proof was unduly curtailed. Furthermore, on the question of due care or the reasonableness of defendant's conduct, the charge may well be inadequate under the ordinary principles of negligence. These questions we need not decide, for the action was not based solely on this theory. Counsel having stipulated that the complaint should be regarded as alleging as well a violation of the Federal Food, Drug, and Cosmetic Act, the District

11. Donaldson v. Great Atlantic & Pacific Tea Co., 1938, 186 Ga. 870, 199 S.E. 213, 128 A.L.R. 456; Doherty v. S. S. Kresge Co., 1938, 227 Wis. 661, 278 N.W. 437; Kelley v. John R. Daily Co., 1919, 56 Mont. 63, 181 P. 326; Meshbesher v. Channellene Oil & Mfg. Co., 1909, 107 Minn. 104, 119 N.W. 428; Pine Grove Poultry Farm, Inc. v. Newtown By-Products Mfg. Co., 1928, 248 N.Y. 293, 162 N.E. 84; Portage Markets Co. v. George, 1924, 111 Ohio St. 775, 146 N.E. 283; Tedder v. Coca-Cola Bottling Co., 1953, 224 S.C. 46, 77 S.E.2d 293.

See also Cotton, "A Note on the Civil Remedies of Injured Consumers," 1 Law and Contemp.Prob. 67 (1933); Note, 26 Va.L.Rev. 100 (1939); 2 Harper and James, The Law of Torts, § 28.26 (1956); Annotation, 128 A.L.R. 464.

Contra: Howson v. Foster Beef Co., 1935, 87 N.H. 200, 177 A. 656; Cheli v. Cudahy Bros. Co., 1934, 267 Mich. 690, 255 N.W. 414; Gearing v. Berkson, 1916, 223 Mass. 257, 111 N.E. 785, L.R.A. 1916D, 1006.

12. Code of Virginia, 1950, §§ 3–306 to 3–322.

13. Code of Virginia, 1950, §§ 54–461 to 54–474.

14. See also: Kinsey v. Brugh, 1931, 157 Va. 407, 161 S.E. 41; Harris v. Howerton, 1938, 169 Va. 647, 194 S.E. 692; Hubbard v. Murray, 1939, 173 Va. 448, 3 S.E.2d 397; Note, 27 Va.L.Rev. 240 (1940); Prosser, The Law of Torts, § 34 (2nd Ed., 1955).

Judge, as we have shown, correctly charged that a violation of the Act would be negligence per se. Thus, it was unnecessary to explain to the jury the elements of due care and foreseeability, and so much of the charge as touched on these aspects gave the defendant more than it could rightfully demand.

■■ The defendant argued parenthetically that other manufacturers of surgical nails habitually label them imprecisely. It is enough to say that even if this were a case of ordinary common law negligence, defendant could not justify its mislabeling on this ground. Customary practice does not prescribe the duty of care. As stated by Mr. Justice Holmes in Texas & Pacific Ry. Co. v. Behymer, 1903, 189 U.S. 468, 470, 23 S.Ct. 622, 623, 47 L.Ed. 905:

> "What usually is done may be evidence of what ought to be done, but what ought to be done is fixed by a standard of reasonable prudence, whether it usually is complied with or not." [15]

### The Rejected Instruction

■ The defendant is aggrieved by the District Judge's refusal of the following requested instruction:

> "Where an injury may have resulted from either one of two acts, one for which the defendant is liable and one for which he is not liable, the burden is on the plaintiff, in order to recover from the defendant, to prove that the injury occurred as a result of the act for which the defendant is liable. If you are unable to determine from the evidence which act caused the injury, you shall return for the defendant."

There was no error in denying this instruction for it mistakenly implies that plaintiff's injury necessarily resulted from a *single cause.* Furthermore, the court properly made it clear that the jury was not restricted from finding for the defendant if it concluded from the evidence that the plaintiff's misfortune resulted solely from misconduct of the operating surgeons. Moreover, there was in fact no evidence raising such an issue,[16] and it was not squarely presented by the defendant in the rejected instruction.

### The Allen Charge

Defendant complains that after the jury reported itself deadlocked, the District Judge erred in instructing it in such a way that it might reasonably have inferred that the minority should yield to the majority.

The jury began its deliberations at 10:00 A.M. on May 28, 1959, and at 3:00 P.M. of the same day, sent a note to the court advising that it was deadlocked. At about 3:30 P.M., the court called the jury, reread part of the instructions, and then concluded as follows:

> "In a large proportion of cases absolute certainty cannot be expected. Although the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows, yet the jurors should examine the question submitted with candor and with proper regard and deference to the opinions of each other. It is your duty to decide the case if you can conscientiously do so. You should listen with a disposition to be convinced of each others' arguments. If much of the larger number are of one opinion, a dissenting juror should consider whether his disagreement is a reasonable one which makes no impression upon the minds of so many

---

15. See, in addition, Judge Hand, in The T. J. Hooper, 2 Cir., 1932, 60 F.2d 737; Prosser, The Law of Torts, § 32 at pp. 135–137 (2nd Ed., 1955).

16. The most that one of the defendant's experts would say was he would not have resorted to intramedullary nailing, but he did not testify that the operating surgeons were negligent in making this election. Neither of defendant's medical experts actually attacked the work of the operators, indicating at most a divergence of opinion.

jurors equally honest, equally intelligent with himself. If, upon the other hand, the majority is the other way, the minority ought to ask themselves whether they might not reasonably doubt the correctness of a judgment which is not concurred in by the majority."

█ We find no error in this instruction, known as the "Allen charge," which repeats almost verbatim the language of the Supreme Court in the leading case of Allen v. United States, 1896, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528. It is proper for the judge to admonish jurors who are in disagreement to re-examine their opinions in light of the contrary opinions of their fellows, provided it is made equally clear that the jury's verdict must represent the final judgment of each juror, and not merely his acquiescence in a majority view of which he remains conscientiously unconvinced.

█ In this circuit, the Allen charge has been upheld in two fairly recent criminal cases, Orton v. United States, 4 Cir., 1955, 221 F.2d 632, and Wolin v. United States, 4 Cir., 1954, 211 F.2d 770. We believe its recognition in the criminal field points a fortiori to its acceptability in civil cases, and there is ample authority for its use in civil cases.[17]

█ Nor was the Allen charge inappropriate, as the defendant argues, simply because the foreman of the jury had reported the jurors hopelessly deadlocked. As a practical matter, the charge is customarily given only when the jury appears to have encountered difficulties in reaching unanimity. If the distinction suggested by the defendant were correct, the court would be precluded from giving the charge in the very circumstances when it is needed most. Moreover, the decisional law supports the use of the instruction in a case in which the jury has previously indicated its difficulty.[18]

*Admission of Machinist's Testimony*

█ Finally, defendant contends that the District Court erred in permitting a machinist, called by the plaintiff, to measure the nail on a specially manufactured gauge consisting of holes machined in a block of metal. In its brief the defendant objects that "[t]his experiment was entirely dissimilar from the insertion of the nail into the human bone and could very well have misled the jury into believing that the experiment duplicated the same circumstances and conditions prevailing in the insertion of the metallic surgical nail in the human bone."

There is no basis for this objection, which really goes to the weight of the evidence, not its admissibility. It was explicitly stated in the presence of the jury that the gauge was not intended to simulate the medullary canal, and it was plain to the jury that the reason for use of the gauge in court was to establish the diameter of the nail.

Portsmouth Transit Co. v. Brickhouse, 1959, 200 Va. 844, 108 S.E.2d 385, upon which defendant relies, is clearly distinguishable. The court there refused to admit evidence of a test conducted for the purpose of simulating conditions existing at the time of a traffic accident, stating that:

"The experiment was based on elements and conditions some of which were and others of which could have been quite different from those existing at the time of the accident, and was therefore inadmissible in evidence."

The demonstration in this case was not unfair or confusing, and did not profess to simulate conditions at the situs of the operation.

The judgment is

Affirmed.

---

17. E. g., Hill v. Wabash Ry. Co., 8 Cir., 1924, 1 F.2d 626; Hoagland v. Chestnut Farms Dairy, 1934, 63 App.D.C. 357, 72 F.2d 729; Boston & M. R. R. v. Stewart, 1 Cir., 1918, 254 F. 14.

18. See e. g., Lias v. United States, 4 Cir., 1931, 51 F.2d 215, 218; Hoagland v. Chestnut Farms Dairy, 1934, 63 App. D.C. 357, 72 F.2d 729, 732.